[No. B154970. Second Dist., Div. Eight. Apr. 9, 2003.]

JOEL DRUM, Plaintiff and Appellant, v.
BLEAU, FOX & ASSOCIATES et al., Defendants and Respondents.

## COUNSEL

James S. Link; Davis & Drum and Joel Drum for Plaintiff and Appellant.

Bleau, Fox & Associates and Farah Faramarzi for Defendants and Respondents.

## OPINION

**RUBIN, Acting P. J.**—Plaintiff and appellant Joel Drum appeals from the judgment entered against him and in favor of defendants and respondents Bleau, Fox & Associates, Thomas P. Bleau, Nikki Fong and Martin R. Fox (collectively referred to as Bleau Fox) on Drum's complaint for abuse of process. Drum contends the trial court erred in granting Bleau Fox's special motion to strike the complaint pursuant to Code of Civil Procedure section 425.16 (hereafter section 425.16 or the anti-SLAPP statute).[1] For the first time on appeal, Bleau Fox contends the action is barred by the litigation privilege of Civil Code section 47, subdivision (b) (hereafter section 47(b)). After review, we conclude Drum established a prima facie case for abuse of process, and that the action is not barred by the litigation privilege. Accordingly, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Bleau Fox represented a plaintiff in a legal malpractice action against Drum and his law firm (the underlying action). On October 26 and 27, 2000,

[1] SLAPP is an acronym for strategic lawsuit against public participation, which was coined by professors at the University of Denver and which has been adopted by our Supreme Court. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57, fn. 1 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*); *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*).)

a jury trial in the underlying action resulted in a judgment in favor of Bleau Fox's client in the amount of $226,000. After the jury was excused, the following colloquy occurred: "[COUNSEL FOR DRUM]: May I make one request? [¶] THE COURT: Yes. [¶] [COUNSEL FOR DRUM]: Pursuant to Code of Civil Procedure section 918,[2] this court has the power to stay this judgment pending the filing of a notice of appeal, or at least the time running to file the notice of appeal. I ask the court to stay this judgment, and we do intend to bring a motion for new trial, and I would like that opportunity to do that before we have to be fighting a judgment debtor examination, or whatever. [¶] THE COURT: We will stay the judgment pending filing of the notice of appeal and motion for new trial, et cetera. All right. [¶] [COUNSEL FOR DRUM]: Thank you. [¶] MS. FONG: Thank you, Your Honor for your time."

On November 6, 2000, judgment was entered in the underlying action. That same day, notice of entry of judgment was served by the clerk of the Superior Court. On December 22, 2000, while the stay was still in effect, Bleau Fox obtained a writ of execution from the superior court clerk.

On January 2, 2001, Drum's motion for new trial was denied. Although Drum's time to file a notice of appeal had yet to expire and the stay was therefore still in effect, Fong caused the writ of execution to be submitted to the Los Angeles County Sheriff and, on January 22, 2001, the sheriff levied on the writ.

Drum learned of the levy on January 29, 2001, when he was notified by his bank that all funds in the multiple accounts Drum maintained were frozen because of the levy. As a result, checks Drum had drawn on those accounts were dishonored. That day, Drum informed Bleau in a telephone call that Drum intended to move ex parte for an order quashing the levy the

---

[2]Code of Civil Procedure section 918 provides: "(a) Subject to subdivision (b), the trial court may stay the enforcement of any judgment or order. [¶] (b) If the enforcement of the judgment or order would be stayed on appeal only by the giving of an undertaking, a trial court shall not have power, without the consent of the adverse party, to stay the enforcement thereof pursuant to this section for a period which extends for more than 10 days beyond the last date on which a notice of appeal could be filed. [¶] (c) This section applies whether or not an appeal will be taken from the judgment or order and whether or not a notice of appeal has been filed." Thus, a trial court may stay enforcement of any judgment, without a bond, for a period not longer than 10 days beyond the last date a notice of appeal could be filed. As applicable here, under California Rules of Court, rule 2, a notice of appeal must be filed on or before 60 days after the superior court clerk mails a notice of entry of judgment to the party filing the notice of appeal. According to rule 3, however, the filing of a valid notice of intention to move for new trial extends the time to appeal from a judgment to 30 days after the superior court clerk mails, or a party serves, notice of entry of an order denying the motion for new trial. Here, the motion for new trial was denied on January 2, 2001, and Drum filed his notice of appeal on January 31, 2001, within the allowable time.

following day. In a subsequent telephone call, Drum's counsel reminded Bleau the trial court had granted his request for a stay pending filing of a notice of appeal, which counsel anticipated would be filed on February 1, 2001. Maintaining the stay had expired when the new trial motion was denied, Bleau Fox refused to withdraw the levy.

On January 30, 2001, Drum made ex parte application to the trial court to withdraw the writ of execution and for an order to show cause re contempt. Bleau Fox opposed the motion, arguing "the stay that was in effect lapsed upon the hearing of the Motion for New Trial." In support, Fong filed a declaration averring she recalled Drum's counsel requesting a stay only until a motion for new trial was heard. Bleau filed a declaration averring that Drum's counsel stated, in his telephone call to Bleau, that he could not recall whether he asked for a stay pending filing of notice of appeal. Drum's counsel filed a declaration categorically denying any such statement.

The trial court granted Drum's application to recall the writ of execution and set aside the levy. The court denied Drum's application for an order to show cause re contempt.

On January 31, 2001, Drum filed a timely notice of appeal from the November 6, 2000, judgment and the January 2, 2001, order denying his motion for new trial, among other things.[3] Pursuant to Code of Civil Procedure section 918, Drum served an undertaking on Bleau Fox that same day.

On April 27, 2001, Drum filed the instant action for abuse of process against Bleau Fox. Drum alleged in his unverified complaint that Bleau Fox's violation of the stay order was done for the sole purpose of causing harm to Drum and with the intention of depriving him of his property and legal rights.

On July 17, 2001, Bleau Fox filed a special motion to strike the original complaint pursuant to section 425.16 on the grounds that Drum could not demonstrate a reasonable probability of success on the merits of his action because he could not establish the ulterior motive element of a cause of action for abuse of process. In support of that motion, Fong submitted a declaration in which she averred she was the only Bleau Fox attorney present on October 27, 2000, and she only heard the trial court stay

---

[3]Fong states in a declaration that notice of appeal was filed on January 6, 2001. Perhaps Fong is confused by the fact that January 6, 2001, was 60 days after the notice of entry of judgment was served on the parties. As we have already explained, California Rules of Court, rule 3 operated to extend the time to file notice of appeal beyond January 6. In any event, the notice of appeal in fact was timely filed on January 31, 2001.

enforcement of the judgment until a motion for new trial was filed and/or heard.

The motion to strike was taken off calendar after Drum filed an amended unverified complaint on August 21, 2001. In his amended complaint, Drum alleged Bleau Fox violated the stay "for the purpose of causing financial harm to [Drum] so that he would be dissuaded from filing an appeal of the underlying action and/or [would] not have the funds available for the purpose of prosecuting such appeal."

On September 18, 2001, Bleau Fox refiled its SLAPP motion. In opposition, Drum submitted the reporter's transcript from the October 27, 2000, proceedings, the relevant portion of which we have quoted above, which shows Fong was present in court when the trial court clearly stated enforcement was stayed "pending filing of the notice of appeal and motion for new trial, et cetera."

At the October 29, 2001, hearing on the SLAPP motion, the trial court indicated its intention to grant the motion to strike because Drum had failed to establish a reasonable probability of success on his claim for abuse of process based on insufficient evidence of ulterior motive. Acknowledging the sufficiency of the evidence of a willful improper use of process, the trial court rejected the proposition that ulterior motive could be inferred from that evidence alone. Finding Drum had thus failed to establish a prima facie case of abuse of process, the trial court granted the motion. In a written minute order, the trial court noted that Bleau Fox presented "evidence that they misunderstood the length of the stay." It found Drum failed to establish a prima facie case of abuse of process in that he failed to show "by direct or circumstantial evidence that [Bleau Fox] acted with an ulterior motive."

Drum filed a timely notice of appeal.[4]

---

[4]Drum included in his designation of the record Bleau Fox's notice of motion to strike the complaint, memorandum of points and authorities and supporting declarations. The clerk's transcript, which was filed on March 19, 2002, included the memorandum of points and authorities, but not the declarations. In a letter to Drum dated March 29, 2002, counsel for Bleau Fox pointed out the omission and requested that Drum write to the court clerk to have the error corrected. In a letter dated April 1, 2002, Drum replied: "Since you had the ability to write me about the problem . . . . it is obvious that you are capable of directing a letter to the superior court and court of appeal. Since you acknowledge that I designated the omitted declarations I do not intend to do anything more at this time." On August 19, 2002, Bleau Fox moved to augment the record to include the omitted declarations, as well as the original summons and complaint, notice of case assignment and statement of disqualification. Drum opposed the motion on the grounds that the request was untimely under former California Rules of Court, rule 5(b) ("Within 10 days after service of the appellant's notice, the

## DISCUSSION

 Drum contends he established a prima facie case of abuse of process sufficient to withstand a special motion to strike pursuant to section 425.16. He argues the "ulterior motive" element of his cause of action for abuse of process can be inferred from the evidence that Bleau Fox willfully obtained a writ of execution and levied on that writ when it knew a stay of enforcement of judgment was in effect. As the parties do not argue the matter, we assume without deciding that actions taken to obtain and enforce a writ of execution are taken in furtherance of the right to petition and so are subject to the anti-SLAPP statute. We conclude, however, Drum established a reasonable probability of success on the merits of his action for abuse of process sufficient to defeat a SLAPP motion, and that the action is not barred by litigation privilege (§ 47(b)). Accordingly, the trial court erred in granting Bleau Fox's motion and dismissing the complaint.

### Standard of Review

 Upon review of an order granting or denying a motion pursuant to section 425.16, the appellate court independently reviews whether a complaint arises out of the defendant's exercise of a valid right to free speech and petition, and, if so, whether the plaintiff established a reasonable probability of prevailing on the complaint. (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456 [125 Cal.Rptr.2d 534] (*Davis*); *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

### The Anti-SLAPP Statute

In pertinent part, section 425.16 provides: "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court *shall consider the pleadings*, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] . . . [¶] (e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:

---

respondent may serve on the appellant and file with the clerk a notice designating additional papers or records . . . to be included in the record on appeal . . . ."). On November 25, 2002, we granted the motion to augment.

(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding . . . authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; . . ." (Italics added.)

█ "Section 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . (§ 425.16, subd. (b)(1).) If the court finds that such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Equilon, supra,* 29 Cal.4th at p. 67; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier I*).)

In the trial court, Drum argued that the levy did not fall within the scope of the anti-SLAPP statute because it involved purely ministerial matters and was not part of an "official proceeding." Drum does not, however, make this argument on appeal and, as noted, we assume, without deciding the question, that the challenged cause of action for abuse of process arises from a protected activity, and is subject to the statute.

*Drum Established a Reasonable Probability of Prevailing on the Merits of His Claim for Abuse of Process*

█ To establish the requisite probability of prevailing, a plaintiff need not prove the validity of the challenged claims against the defendant. He or she need only " ' "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' . . . [¶] Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier I, supra,* 29 Cal.4th at pp. 88-89, citations & italics omitted.)

Thus, special motions to strike pursuant to section 425.16 "operate 'like a demurrer or motion for summary judgment in "reverse." ' " (*Briggs, supra,* 19 Cal.4th at p. 1123, citing *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 718-719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [plaintiff opposing Code Civ. Proc., § 425.13, subd. (a) motion, must demonstrate existence of

legally sufficient claim that is supported by competent, admissible evidence].) Like other statutes which provide a procedure for exposing and dismissing certain causes of action lacking merit, section 425.16 requires the court " 'at a preliminary stage of the litigation, to determine by examining affidavits the "substantial probability" of plaintiff's prevailing on a claim, whether evidence "substantiates" a standard of proof the plaintiff must meet, or whether plaintiff has "established . . . a reasonable probability" of recovery.' [Citation.]" (*Equilon, supra*, 29 Cal.4th at p. 64.) Evidence that the defendant's conduct, although a protected activity, was not valid, goes toward discharging the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case. (*Navellier I, supra*, 29 Cal.4th at p. 94.) We now turn to the merits of Drum's cause of action.

■ The tort of abuse of process constitutes the use of a legal process against another to accomplish a purpose for which it is not designed. (*Brown v. Kennard* (2001) 94 Cal.App.4th 40, 49 [113 Cal.Rptr.2d 891] (*Brown*); *O'Keefe v. Kompa* (2000) 84 Cal.App.4th 130, 134 [100 Cal.Rptr.2d 602] (*O'Keefe*); *Ion Equipment Corp. v. Nelson* (1980) 110 Cal.App.3d 868, 876 [168 Cal.Rptr. 361] (*Ion*), quoting Rest. Torts, § 682.) Its elements are: (1) an ulterior motive; and (2) a willful act in the use of process not proper in the regular conduct of the proceedings. (*Brown, supra*, 94 Cal.App.4th at p. 44; *Merlet v. Rizzo* (1998) 64 Cal.App.4th 53, 64 [75 Cal.Rptr.2d 83] (*Merlet*).) "[T]he essence of the tort 'abuse of process' lies in the misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice. . . ." (*Meadows v. Bakersfield S. & L. Assn.* (1967) 250 Cal.App.2d 749, 753 [59 Cal.Rptr. 34]; see also *Stoltz v. Wong Communications Limited Partnership* (1994) 25 Cal.App.4th 1811, 1822 [31 Cal.Rptr.2d 229].) In *Brown*, the court recognized "an action for abuse of process may inhere where a wrongful levy is executed upon exempt property." (*Brown, supra*, 94 Cal.App.4th at p. 44.)

■ Here, the act of levying on a writ of execution at a time when enforcement of the judgment had been stayed, the stay had been announced in open court in defendant's presence, and a minute order had memorialized the stay, established a prima facie case of the "willful act in the improper use of process" element of the tort.

Establishing a prima facie case of "ulterior motive" is more difficult. ■ "For purposes of abuse of process, the ulterior motive to prove is that the party employing the process did so for an end not germane thereto. [Citation.] And, an improper purpose may consist in achievement of a benefit totally extraneous to or of a result not within its legitimate scope.

[Citations.]" (*Ion, supra,* 110 Cal.App.3d at p. 876.)[5] In *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 824 [102 Cal.Rptr.2d 562, 14 P.3d 234], our Supreme Court held that the ulterior motive or malice element of an abuse of process claim may be inferred from the willful abuse of the process. (See also *Tranchina v. Arcinas* (1947) 78 Cal.App.2d 522, 524 [178 P.2d 65] ["it is well settled that the intention with which a party did an act may be inferred from evidence of his subsequent conduct"].)

■ Here, the first amended complaint alleges Bleau Fox's motive in levying on the writ of execution in violation of the stay was to cause such financial harm to Drum "that he would be dissuaded from filing an appeal of the underlying action and/or would not have the funds available for the purpose of prosecuting such appeal." In opposition to the special motion to strike, Drum presented evidence that Fong was present in court when the trial court granted Drum's request for a stay of enforcement of the judgment until notice of appeal was filed. Disregarding the court ordered stay, Bleau Fox caused a writ of execution to be issued and levied against Drum's bank accounts. When reminded of the stay by Drum's counsel, Bleau Fox continued to deny its existence and refused to cancel the writ of execution. As a result, Drum was required to apply to the trial court for appropriate relief. From this evidence of willful abuse of process, the timing of the unlawful levy and its financial consequences, a reasonable trier of fact could infer the requisite ulterior motive suggested by Drum in his pleadings: Bleau Fox intended to deplete Drum's resources to hinder his ability to pursue an appeal of the judgment.[6]

---

[5]In *Ion*, the plaintiff brought an action for abuse of process against the defendant based upon the defendant having obtained and caused to be executed a writ of execution while enforcement of a money judgment was stayed on appeal pursuant to Code of Civil Procedure section 917.1 (undertaking required to stay enforcement of a money judgment pending appeal). The defendant obtained judgment on the pleadings. The appellate court affirmed, reasoning that the pleadings indicated only that the defendant's motive in executing the writ was to collect an unsatisfied judgment that the plaintiff owed to the defendant, which did not satisfy the element of an ulterior motive: "Issuance of the writ may be improper, but since [the plantiff's] cause of action is framed as one for abuse of process, it must still sufficiently plead the elements necessary in establishing the tort. [The plaintiff] has failed to do so because it has not established the intent on [the defendant's] part in causing the writ to issue. . . ." (*Ion, supra,* 110 Cal.App.3d at p. 877.)

[6]The evidence offered by Bleau Fox to suggest that it did not act with an ulterior motive consisted primarily of fuzzy recollection and inattention by Attorney Fong. She stated in a declaration filed in support of the SLAPP motion that that she did not hear the judge stay enforcement pending the filing of a notice of appeal, a claim belied by her presence in the courtroom when the stay was plainly requested and ordered, and by the minute order that followed. Fong and Attorney Thomas Bleau also gave differing accounts of their knowledge of the written order: Fong stated that as of the time of the hearing on the new trial motion

We are not persuaded to the contrary by Bleau Fox's argument that *Vacanti* is inapposite because it was decided in the procedural context of a demurrer. "Ulterior motive" is a state of mind, which, like other states of mind, can seldom be proved by direct evidence. It must be inferred from objective or external circumstantial evidence. In *Vacanti*, the issue was whether the plaintiff pled sufficient facts from which ulterior motive could be inferred. In the context of a section 425.16 motion, the issue is whether the plaintiff proffers sufficient evidence for such an inference. Under *Vacanti*, an allegation of an egregious willful abuse of process is sufficient. The same rule applies to Drum's proffered evidence.

 Once again, this does not end our inquiry. Bleau Fox asserts for the first time on appeal that section 47(b) bars Drum's suit for abuse of process. We disagree.

*The Litigation Privilege Does Not Preclude Drum's Abuse of Process Claim*

 Known in pertinent part as the litigation privilege, section 47(b) provides that a privileged "publication or broadcast" is one made: "In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandate]." The statute applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) which have some connection or logical relation to the action. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*); *Brown, supra*, 94 Cal.App.4th at p. 45; *O'Keefe, supra*, 84 Cal.App.4th at p. 134; *Merlet, supra*, 64 Cal.App.4th at pp. 64-65.)

 Bleau Fox maintained in the trial court that the anti-SLAPP statute was intended to supplant the litigation privilege. It further argued that suits for abuse of process were "not subject to the litigation privilege" and were

---

(Jan. 2, 2001) she "did not recall that the Trial Court had included in its minute order that enforcement of the judgment was stayed until a notice of appeal was filed." In contrast to Fong's lack of recollection, Bleau stated positively that "no one from our office knew the trial court had included language in its minute order which included the filing of the appeal also." Drum's attorney, James Link, also disputed Bleau's statement that Link had told him that he (Link) did not know whether he had asked for a stay through the filing of the notice of appeal. These discrepancies give further weight to Drum's prima facie case of ulterior motive.

instead subject to the anti-SLAPP statute.[7] Thus, the trial court did not have occasion to pass on the applicability of the litigation privilege in this case.[8]

On November 30, 2001, one month after the hearing on the anti-SLAPP motion, the Third District Court of Appeal decided in *Brown, supra*, 94 Cal.App.4th 40, that the litigation privilege barred suit for abuse of process arising out of allegations the defendant caused a wrongful writ of execution to be levied upon the plaintiff's categorically exempt funds (i.e., Social Security and personal retirement benefits). Accordingly, on appeal Bleau Fox relies on *Brown* to argue that its conduct in obtaining a writ of execution and levying on Drum's property was absolutely privileged under section 47(b). Although Bleau Fox correctly characterizes *Brown*, we respectfully disagree with our colleagues from the Third District as to the application of the privilege to a postjudgment levy on property.

A brief review of the purpose and history of the litigation privilege is helpful to an understanding of why we conclude that to apply the defense in the present case would be an unwarranted extension of the privilege, supported by neither the statutory language nor sound public policy.

■ Section 47(b) derives from common law principles establishing a defense to the tort of defamation. (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1163 [232 Cal.Rptr. 567, 728 P.2d 1202] (*Oren*).) On its face, the statute applies to only a "publication or broadcast." (§ 47(b).) Its purpose is to afford litigants free access to the courts without the threat of, and harassment by, derivative

---

[7] In support of this argument that section 425.16 "supplants" the litigation privilege, Bleau Fox cited Justice Baxter's dissenting opinion in *Briggs, supra*, 19 Cal.4th at page 1136, in which he wrote that the majority's interpretation of the anti-SLAPP legislation "stands to supplant Civil Code section 47, subdivision (b)'s absolute litigation privilege for communications made in any legislative, judicial, or other official proceeding authorized by law. [Citation.] From a practical standpoint, why, under the majority's rationale, would a defendant move, *at his own expense*, to dismiss an unmeritorious lawsuit based on Civil Code section 47, subdivision (b)'s otherwise applicable litigation privilege for statements made in official proceedings, when, under the majority's expansive interpretation of the anti-SLAPP legislation, he could instead move to specially strike the suit as a retaliatory SLAPP suit and thereby immediately cut off discovery in the litigation and recover his attorney fees if dismissal is ultimately ordered?" (Original italics.) We do not understand Justice Baxter to have meant that the majority opinion found the Legislature intended section 425.16 to take the place of Civil Code section 47. Rather, we believe the dissent was observing that, as a practical matter, under the majority's broad interpretation of the anti-SLAPP statute, litigants would regularly use section 425.16 instead of other procedural devices predicated on Civil Code section 47 in order to take advantage of the attorney's fees provision in the former. (See also *Navellier v. Sletten* (2003) 106 Cal.App.4th 763 [131 Cal.Rptr.2d 201] (*Navellier II*.)

[8] Although the litigation privilege was not addressed in the trial court, both parties have briefed the issue here, and it is, therefore, ripe for adjudication.

litigation. (*Silberg, supra,* 50 Cal.3d at p. 213; *Brown, supra,* 94 Cal.App.4th at p. 45.) Because it applies without regard to malice or evil motives, the privilege is characterized as "absolute." (*Silberg, supra,* 50 Cal.3d at pp. 215-216.)

Although the genesis of the privilege resides in defamatory publications, its application has been far more widespread. It is now beyond debate that the privilege applies to any *communication,* whether or not it amounts to a publication (see, e.g., *Rosenthal v. Irell & Manella* (1982) 135 Cal.App.3d 121, 126 [185 Cal.Rptr. 92]; *Block v. Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 390 [182 Cal.Rptr. 438]), and to "all torts except malicious prosecution." (*Silberg, supra,* 50 Cal.3d at p. 212.)[9] The Court of Appeal first applied the litigation privilege to abuse of process in *Thornton v. Rhoden* (1966) 245 Cal.App.2d 80, 94-100 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152].) There, Justice Kaus warned that the courts would be looking with an unseeing eye to the policies behind the litigation privilege, if the defense were limited to defamation claims. "The salutary purpose of the privilege should not be frustrated by putting a new label on the complaint. If it is desirable to create an absolute privilege in defamation, not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with libel or slander actions while acting for his client, we should not remove one concern [defamation] and saddle him with another [abuse of process] for doing precisely the same thing." (*Id.* at p. 99.) Following *Thornton,* a considerable number of cases have followed that decision and "have found abuse of process actions untenable on the basis of the statutory privilege." (*Oren, supra,* 42 Cal.3d at p. 1165, citing *Younger v. Solomon* (1974) 38 Cal.App.3d 289 [113 Cal.Rptr. 113]; *Umansky v. Urquhart* (1978) 84 Cal.App.3d 368 [148 Cal.Rptr. 547]; *Drasin v. Jacoby & Meyers* (1984) 150 Cal.App.3d 481 [197 Cal.Rptr. 768]; *Asia Investment Co. v. Borowski* (1982) 133 Cal.App.3d 832 [184 Cal.Rptr. 317, 30 A.L.R.4th 561].)

Much as the litigation privilege has escaped from the initial confines of defamation and publication, so, too, has the privilege been affixed to matters

---

[9]Our Supreme Court initially applied the privilege outside the defamation context in *Albertson v. Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405] (slander of title, lis pendens). Since then a variety of other torts have been subject to the defense. See, for example, *Ribas v. Clark* (1985) 38 Cal.3d 355, 364-365 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] (*Ribas*) (statutory invasion of privacy); *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 640 [99 Cal.Rptr. 393] (intentional infliction of emotional distress); *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592] (same); *Pettitt v. Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650] (same, fraud and negligence); *Agostini v. Strycula* (1965) 231 Cal.App.2d 804 [42 Cal.Rptr. 314] (inducing breach of contract); *Brody v. Montalbano* (1978) 87 Cal.App.3d 725, 737-738 [151 Cal.Rptr. 206] (intentional interference with prospective economic advantage); *Block v. Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d 386 (professional negligence).

beyond the courtroom. Thus, the filing of a lis pendens with the county recorder is privileged (*Albertson v. Raboff, supra,* 46 Cal.2d at p. 379), as are demand letters sent prior to litigation (*Lerette v. Dean Witter Organization, Inc., supra,* 60 Cal.App.3d at p. 577), threats associated with settlement negotiations (*Asia Investment Co. v. Borowski, supra,* 133 Cal.App.3d at p. 842), and an attorney's tortious solicitation of potential plaintiffs (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1191, 1194-1195 [17 Cal.Rptr.2d 828, 847 P.2d 1044] (*Rubin*)). There are apparently no fixed temporal or geographical limitations as long as there is "some relation" to a judicial proceeding contemplated or extant. (*Id.* at p. 1194.)

▇▇▇ It is with this backdrop that Bleau Fox argues that even if levying on property of a judgment debtor pursuant to a writ of execution obtained in violation of a stay constitutes an abuse of process, it is privileged. In so doing, Bleau Fox has overlooked the one limitation on the privilege that still survives: the event claimed to be protected must be *communication* not *conduct.* Even though our Supreme Court has on at least four occasions emphasized the difference between communication and conduct in applying section 47(b), that distinction has been lost on some appellate courts with which we part company.

In *Kimmel v. Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524] (*Kimmel*), the cross-defendants had secretly taped a conversation involving cross-complainants in violation of Penal Code section 632 (unlawful to record telephone conversation without consent). The cross-complaint sought damages under various tort theories. The trial court granted judgment on the pleadings, concluding that the taping was in anticipation of litigation and hence privileged under section 47(b). The Supreme Court reversed. Its analysis started with the case of *Ribas, supra,* 38 Cal.3d 355. *Ribas* was a divorce action. At an arbitration hearing, the wife's attorney testified that while she was secretly listening to a telephone conversation between the husband and wife she heard the husband tell the wife that he had prevented her from retaining an attorney during earlier dissolution proceedings. The husband then sued the wife's attorney for invasion of privacy. The Supreme Court distinguished a claim based on the *act of eavesdropping,* which was not subject to the litigation privilege, and one founded on the attorney giving testimony at the arbitration hearing, which was a *communication* that fell within the privilege. (*Id.* at pp. 364-365.)

"Implicit in the *Ribas* decision was the distinction between injury allegedly arising from communicative acts, i.e., the attorney's testimony, and injury resulting from noncommunicative conduct, i.e., the invasion of privacy resulting from the attorney's eavesdropping. This distinction has traditionally served as a threshold issue in determining the applicability of

section [47(b)]." (*Kimmel, supra,* 51 Cal.3d at p. 211.) In *Kimmel* the court described the claimed injuries as not arising from the "broadcast and publication" (the statutory language) of private conversations but from the *act* of recording them. (*Id.* at p. 212.) "We note that plaintiffs have not cited a single case in which section [47(b)] has been held to bar suit for personal injuries arising from noncommunicative conduct that occurred during a judicial proceeding. On the contrary, a review of the myriad cases that have applied section [47(b)] to shield defendants from liability demonstrates that, without exception, the privilege has applied only to torts arising from statements or publications." (*Id.* at p. 211; see also *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 482 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake Community Hospital*) [act of terminating physician staff privileges not subject to § 47(b) because statute applied only to "statements and publications" not "actions"].)

Following *Kimmel, Ribas,* and *Westlake Community Hospital,* the Supreme Court again had occasion to visit the act/communication threshold in *Rubin, supra,* 4 Cal.4th 1187. In *Rubin,* the plaintiff's cause of action was founded on the common law offense of "barratry," the act of "frequently exciting and stirring up suits and quarrels." (4 Blackstone, Commentaries 134; see Pen. Code, §§ 158, 159.) The plaintiff alleged that the defendant had used improper methods in soliciting tenants in a trailer park residence as potential plaintiffs in a lawsuit against the park owners for housing violations. (*Rubin, supra,* 4 Cal.4th at p. 1191.) The defendant raised the litigation privilege by way of demurrer, which was sustained without leave to amend. The Supreme Court first reiterated that the fact the solicitations occurred before litigation did not defeat the privilege. It then wrestled with whether the defendant's alleged wrongs consisted of acts or communications, observing that the fact that "defendants' communications with [trailer park] residents necessarily involved related acts [does not] destroy the privilege." (*Id.* at p. 1195.) The court considered its earlier decision in *Kimmel,* pointing out that the claimed abuse there was the unprivileged act of taping, " 'not from any "publication." ' " (*Ibid.,* citing *Kimmel, supra,* 51 Cal.3d at p. 209.) The court found *Ribas* equally instructive on the act/communication dichotomy, noting there that damages for the act of *eavesdropping* were recoverable, those "resulting from the *testimonial* use of the contents of the overheard conversation" were not. (*Rubin, supra,* 4 Cal.4th at p. 1195; quoting *Ribas, supra,* 38 Cal.3d at p. 364.) Applying these principles to the facts in *Rubin,* the court concluded that the litigation privilege would not apply " 'to the injury resulting from plaintiffs' and [their attorney's] *conduct.* To the extent the complaint rests on [the attorney's] alleged communicative acts of "counseling" and "advising" his clients, the privilege is clearly operative.' . . . Judging from the allegations of the amended complaint, plaintiffs' claims, however styled, are

founded essentially upon the alleged misrepresentations made by the law firm (and Green)" to the trailer park residents. (*Rubin, supra,* 4 Cal.4th at pp. 1195-1196.) Accordingly, the privilege defeated the plaintiff's claims.

In agreeing with the trial court, the Supreme Court in *Rubin* recognized that conduct is often stirred with communication and vice versa. It directed that the inquiry be into whether the activities were "communicative in their essential nature . . . ." (*Rubin, supra,* 4 Cal.4th at p. 1196.) If so, the privilege applies. We, too, recognize that lines in this area are likely to be drawn with brushes and not cut with X-Acto knives. Here, the actual levying on property falls squarely on the side of conduct. This becomes clearer when one considers the process by which judgments are enforced. Initially the judgment is prepared, then the judgment creditor may make application for a writ of execution, the writ is issued, and instructions are given to the levying officer. The "essential nature" of this part of the process is communicative, at least from the perspective of the judgment creditor and its lawyer. The various documents filed or delivered reflect *statements* that there is a judgment, that it is subject to execution, and that there exists certain property subject to levy.

The line is crossed when the levying officer, on behalf of the judgment creditor, actually levies on the property. That is a taking: the *act* of removing property from one source (here a financial institution) and depositing it in a place controlled by the levying officer. Whatever *statements* may be inherent in that part of the process are tangential, or in the words of the court in *Rubin,* not "essential."

Indeed, the Supreme Court in *Kimmel* recognized the danger in the rote assumption that once a statement is implicated all other activities that follow are also communicative. "Finally, we note that the result urged by the plaintiffs, an extension of section 47[b] to unlawful conduct undertaken to obtain evidence in anticipation of litigation, would lead to unacceptable consequences. Suppose a prospective defendant kept important documents at home. If a prospective plaintiff, in anticipation of litigation, burglarized defendant's premises in order to obtain evidence, plaintiff here would apparently apply the privilege to protect the criminal conduct. Such an extension of section 47[b] is untenable." (*Kimmel, supra,* 51 Cal.3d at p. 212.)[10]

Bleau Fox cites a single case, *Brown, supra,* 94 Cal.App.4th 40, in support of its position that the wrongful levy is privileged. In *Brown,* the court was

---

[10]For a recent discussion of the communicative acts/noncommunicative conduct threshold see *Navellier II, supra,* 106 Cal.App.4th 763.

faced with an abuse of process claim arising out of the execution on exempt Social Security and retirement funds. A demurrer was sustained without leave to amend. The Court of Appeal correctly chronicled the development of the privilege from defamation to other torts and to statements outside the courtroom. It also observed that "the threshold issue in determining whether the privilege applies is whether the injury results from communicative acts or noncommunicative conduct." (*Id.* at p. 45.) However, the appellate court then changed its focus from the act-versus-communication inquiry to whether the activity occurred " 'completely outside the judicial proceedings' " and therefore "outside the litigation privilege." (*Id.* at p. 47.) In so doing, it appears to us the court of appeal lost sight of the fact that the essential nature of actually levying on exempt funds was not communication but was action. (*Id.* at pp. 48-50.) The opinion states: "The act of applying for a writ is privileged. The privilege extends to torts arising from the privileged statement or publication. As such, not only does the privilege protect the application for the writ of execution, it also extends to the act of carrying out the directive of the writ. To hold otherwise would effectively strip the litigation privilege of its purpose." (*Id.* at p. 50, fns. omitted.)[11]

We respectfully disagree. The privilege is limited by its statutory language to publications and broadcasts. The Supreme Court has regularly reminded that the privilege does not apply to conduct. Thus, it does not follow that, merely because the application for the writ—essentially the statement by the judgment creditor to the clerk that the creditor has a judgment and requests the issuance of a writ—is a privileged communication, subsequent acts in

---

[11]Our conclusion that *Brown* strays from the proper inquiry of whether an event is an act or communication is fortified by its treatment of a line of cases starting with *Arc Investment Co. v. Tiffith* (1958) 164 Cal.App.2d Supp. 853 [330 P.2d 305]. (See *Brown, supra,* 94 Cal.App.4th at pp. 46-48.) In *Tiffith*, the judgment creditor executed on exempt property three times. The appellate division concluded the conduct constituted an abuse of process. (164 Cal.App.2d at p. Supp. 856.) Similarly in *Czap v. Credit Bureau of Santa Clara Valley* (1970) 7 Cal.App.3d 1, 5 [86 Cal.Rptr. 417], the judgment creditor had obtained one levy and threatened future levies despite its knowledge that the debtor's wages were exempt. Finally, in *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 104 [101 Cal.Rptr. 745, 496 P.2d 817], the collection agency intentionally filed actions in improper counties in order to impair the purported debtors' ability to litigate the dispute and to coerce easy settlements. *Brown* correctly notes that in each of these cases the appellate court acknowledged that the allegations supported an abuse of process cause of action but that none of the three discussed the application of the litigation privilege. The *Brown* court went on to say: "More recent decisions invoking that privilege, have strictly limited use of that tort in the judgment enforcement context, at least where successive seizures of exempt property are not involved. . . ." (*Brown, supra,* 94 Cal.App.4th at pp. 46-47.) The purported distinction between the *Tiffith* line and the "more recent cases," we believe, has no linguistic, and no legal, support. A communication does not become an act simply because it is repeated. Thus, if the *Tiffith, Czap* and *Barquis* courts correctly state a rule that multiple post judgment levies or similar conduct are "acts," they are not retroactively morphed into a "communication" simply because they occur, as in the present case, only once.

levying on property are likewise privileged. We agree with the decisions of other appellate courts that certain steps taken preliminary to actual levy are communicative in nature. For example, in *Merlet, supra,* 64 Cal.App.4th 53, the court correctly concluded that filing with the court an application for a writ of sale and seeking reconsideration of an order denying the application are essentially communicative in nature and therefore privileged. Nor does the rule we adopt today run counter to Supreme Court and Court of Appeal decisions that uphold the privilege in the context of the filing of lis pendens (*Albertson v. Raboff, supra,* 46 Cal.2d 375), mechanics liens (*Frank Pisano & Associates v. Taggart* (1972) 29 Cal.App.3d 1 [105 Cal.Rptr. 414]), or homeowners assessment liens (*Wilton v. Mountain Wood Homeowners Assn.* (1993) 18 Cal.App.4th 565 [22 Cal.Rptr.2d 471]). Each of these cases implicitly recognizes that a lien is at its core not conduct but a notice, a statement, to the world, of a potential interest in property. It thus comes within the purview of communication.[12]

Finally, we note that the failure to distinguish between conduct and communication runs the risk of essentially eliminating the tort of abuse of process, something we do not believe the Legislature intended when it amended the litigation privilege in the 1873-1874 session to include publications made in judicial proceedings. (Historical Note, 6 West's Ann. Civ. Code (1982 ed.) foll. § 47, p. 239.) Given the expansion of the privilege to matters not only inside but outside the courtroom, and not only during trial but before and after trial, to sweep conduct within the privilege's ambit would in all likelihood nullify the tort. If that is the inevitable next step, it should be undertaken by the Legislature, not by the judiciary's expansive reading of a statute that itself was limited in its origins. (*Oren, supra,* 42 Cal.3d at p. 1163.)

We therefore conclude that wrongfully levying on property pursuant to a writ of execution is not subject to the litigation privilege.

---

[12]For the reasons stated in our discussion of *Brown*, we also disagree with the Fourth District's decision in *O'Keefe, supra,* 84 Cal.App.4th 130, a case not cited by Bleau Fox but relied upon by *Brown*. There the appellate court was presented with two aspects of the execution process: filing of an abstract of judgment and executing on a bank account. Although it held that both were protected by the privilege, we would conclude that the former is a statement and hence protected, the latter is conduct and not. The *O'Keefe* court does not discuss the Supreme Court's decisions in *Kimmel, Ribas, Westlake Community Hospital,* or *Rubin,* and appears to draw no distinction between conduct and statements. (See *O'Keefe, supra,* 84 Cal.App.4th at p. 135 ["privilege also applies to conduct or publications occurring outside the courtroom"].)

## DISPOSITION

The judgment is reversed. Drum shall recover his costs on appeal.

Boland, J., and Hastings, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution,