[No. B174458. Second Dist., Div. Eight. June 17, 2005.]

MICHAEL BUCHANAN, Plaintiff and Appellant, v.
MAXFIELD ENTERPRISES, INC., Defendant and Respondent.

Counsel

Law Offices of Baird Brown and Baird Brown for Plaintiff and Appellant.

Murchison & Cumming and Gina E. Och for Defendant and Respondent.

Opinion

**FLIER, J.**—The trial court sustained respondent's demurrer to appellant's first amended complaint without leave to amend on the ground that the litigation privilege bars the action. We find that the privilege does not apply and remand for additional proceedings.

## FACTS

■ "Although a demurrer makes no binding judicial admissions, it provisionally admits all material issuable facts properly pleaded, unless contrary to law or to facts of which a court may take judicial notice. On the other hand, it does not admit contentions, deductions or conclusions of fact or law alleged in the challenged pleading. [Citations.] To the extent there are factual issues in dispute, however, this court must assume the truth not only

of all facts properly pled, but also of those facts that may be implied or inferred from those expressly alleged in the complaint. [Citations.] [¶] On appeal, the trial court's decision to sustain the demurrer without leave to amend and subsequent judgment are subject to review for abuse of discretion. As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend. Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result. The burden is on the plaintiff to demonstrate the manner in which the complaint might be amended, and the appellate court must affirm the judgment if it is correct on any theory." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith* (1998) 68 Cal.App.4th 445, 459–460 [80 Cal.Rptr.2d 329] (*Atascadero v. Merrill Lynch*).)

The first amended complaint commences with general allegations that are incorporated into the seven causes of action alleged in this complaint.[1] The general allegations are that appellant Michael Buchanan, who is a retail store manager, went shopping on December 14, 2002, in respondent Maxfield Enterprises, Inc.'s store, which is located on Melrose Avenue in Los Angeles. According to the complaint, the Maxfield store sells "high-end fashion clothing and vintage home furnishings." Appellant did not know, at the time he entered the store, that celebrities Jennifer Lopez and Ben Affleck were also in the store, shopping.

Less than 20 minutes after appellant entered the store, Maxfield store manager Jacqueline Sassoon asked appellant to leave the store.[2] When appellant asked Sassoon for an explanation, she refused to give a reason. The head of Maxfield store security, Michael Newson, asked Los Angeles County sheriff's deputies, who were present because of the two celebrities, to evict appellant from the store.[3]

The deputies approached appellant in the store, and told him that the management wanted him to leave. According to the sheriff's incident report quoted in the complaint, appellant became "enraged," and asked why they wanted him to leave. Newson told the deputies that he wanted appellant arrested. The deputies replied that "they," meaning Maxfield store personnel, would have to make a citizen's arrest. Newson "proceeded to make a

---

[1] All references to the "complaint," unless otherwise noted, are to the first amended complaint.

[2] The complaint names Maxfield and Does as defendants. No individuals are named as defendants.

[3] After the first amended complaint was filed, and before respondent's demurrer and motion to strike were heard and decided, appellant amended the complaint to add the County of Los Angeles as a defendant, in lieu of Doe I. The record before us does not reflect an appearance by the county.

citizen's arrest of [appellant] for 'trespassing.' " "The deputies then hand-cuffed [appellant] and, with Sassoon and Newson in tow, marched [appellant] into the Maxfield parking lot."

Because of the presence of Lopez and Affleck, the parking lot was "thronged" with TV and other media reporters and film crews. "Defendants, Sassoon, Newson and the deputies led [appellant], handcuffed, straight into the media circus." "Defendants, Sassoon, Newson and the deputies knew full well that they were marching [appellant] into the media circus." After appellant was "paraded around the store parking lot," Sassoon told the deputies that she did not want appellant arrested after all. The deputies removed the handcuffs and appellant was free to leave.

The complaint cites excerpts from television and print media that purported to report that a stalker had shadowed Lopez and Affleck in the Maxfield store, and that the stalker was removed from the scene by police officers who had responded to a call from the store about the stalker.

The complaint denies that appellant was a stalker and also denies that appellant had engaged in inappropriate behavior. The general allegations of the complaint close with this: "Defendants demanded that [appellant] leave Maxfield, falsely arrested and imprisoned him, and paraded him in handcuffs before the media, because defendants then and now arbitrarily discriminate against, refuse to serve and make examples of customers whom defendants deem 'unworthy' of shopping at their Melrose Avenue store."

The first cause of action for invasion of privacy alleges that the defendants "invaded [appellant's] right to privacy by parading him, handcuffed, before the media," and that, as a result of this, appellant suffered injury to his reputation, and suffered mental anguish and emotional distress. The remaining causes of action allege injuries and damages in a similar vein. The second cause of action for false imprisonment alleges that defendants "seized and arrested [appellant] and restrained him against his will and over his protest, without any warrant of arrest or any process of any kind and without any justification or cause to believe that plaintiff had committed any crime." The third cause of action is based on a violation of the Unruh Civil Rights Act and alleges that the defendants "arbitrarily discriminated against [appellant] in ordering him to leave Maxfield, wrongfully arresting him and forcibly evicting him from the store," and that the defendants thereby violated Civil Code section 51. The fourth cause of action is for the intentional infliction of emotional distress and alleges that the defendants' *conduct* was outrageous.

The fourth and fifth causes of action, alleging respectively a negligent infliction of emotional distress and negligence, state that the defendants breached their duty of care by "creating foreseeable peril." The seventh cause of action, based on Business and Professions Code section 17200 et seq., alleges that the defendants' unlawful practices include "the arbitrary discrimination against and refusal to serve customers whom defendants deem 'unworthy' of shopping at their Melrose Avenue store, and the false arrest and imprisonment of such customers at defendants' Melrose Avenue store."

Respondent Maxfield demurred to the complaint on several grounds, one of which was appellant's action was barred because Maxfield's actions are absolutely privileged under Civil Code section 47.[4] The trial court sustained the demurrer "without leave to amend as to all causes of action pursuant to Civil Code Section 47(b) and (c), privileged communications. [¶] Defendant's motion to strike is rendered moot."

## DISCUSSION

Without citing any authorities, appellant contends that the privilege set forth in Civil Code section 47 (hereafter section 47) does not apply because appellant sued Maxfield for two acts of "noncommunicative conduct." These acts were Maxfield's citizen's arrest of appellant and the invasion of appellant's privacy by parading him, handcuffed, in front of the media.

"The threshold issue in determining whether the litigation privilege applies is whether the defendant's conduct was communicative or noncommunicative. (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 211 [271 Cal.Rptr. 191, 793 P.2d 524]; *Mero v. Sadoff* (1995) 31 Cal.App.4th 1466, 1480 [37 Cal.Rptr.2d 769].) As we pointed out in *Kupiec v. American Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326 [1 Cal.Rptr.2d 371], 'section 47, subdivision (b)(2), applies only to communicative acts and does not privilege tortious courses of conduct. [Citations.]' (*Id.* at p. 1331.)" (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 345 [60 Cal.Rptr.2d 539], cited with approval in *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 830 [135 Cal.Rptr.2d 1, 69 P.3d 927].) "[T]he Supreme Court in *Rubin* [*v. Green* (1993) 4 Cal.4th 1187] [17 Cal.Rptr.2d 828, 847 P.2d 1044] recognized that conduct is often stirred with communication and vice versa. It directed that the inquiry be into whether the activities were 'communicative in their essential nature . . . .' (*Rubin, supra,* 4 Cal.4th at p. 1196.) If so, the privilege applies." (*Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1026 [132 Cal.Rptr.2d 602].)

---

[4] Civil Code section 47 provides in relevant part as follows: "A privileged publication or broadcast is one made: [¶¶] (a) In the proper discharge of an official duty. [¶¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ."

■ In *Wang v. Hartunian* (2003) 111 Cal.App.4th 744 [3 Cal.Rptr.3d 909], a dispute between neighbors led Hartunian to obtain a restraining order against Wang. When Hartunian observed Wang standing at the property line, threatening and yelling at him in violation of the restraining order, Hartunian called the police and reported the incident. The police inquired of Hartunian whether he wished to make a citizen's arrest. Hartunian signed a "Private Person's Arrest" form, pursuant to which Wang was arrested and detained. (*Id.* at p. 746.) The court of appeal held: "While we agree that a report to police is subject to the privilege of Civil Code section 47, subdivision (b), we conclude that placing someone under a 'citizen's arrest' is not a 'publication or broadcast' within the meaning of section 47, and thus not privileged. [¶] In *Williams v. Taylor* (1982) 129 Cal.App.3d 745 [181 Cal.Rptr. 423], the Court of Appeal held that the litigation privilege shields a citizen from liability based on a report to police of potential criminal activity: '[A] communication concerning possible wrongdoing, made to an official government agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an "official proceeding" as a communication made after an official investigation.' (*Id.* at p. 753; see also *Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1503 [28 Cal.Rptr.2d 722].) Thus, had Hartunian summoned the police, and reported to them Wang's conduct with the intention of prompting his arrest, and had the police, after conducting an investigation based upon that report, arrested Wang, Hartunian's conduct of making a report to the police might fall within the ambit of Civil Code section 47, subdivision (b). According to the evidence in the record, however, that is not what happened. Rather, after the police declined to arrest Wang based on Hartunian's report, Hartunian arrested Wang, and delivered him to the police, which he was obligated to do pursuant to Penal Code section 847, subdivision (a)." (*Wang v. Hartunian, supra,* 111 Cal.App.4th at p. 749, fn. omitted.)

Accepting, as we must, the factual allegations of the complaint as true, it appears that the gravamen of the complaint is that Maxfield personnel effected a citizen's arrest and that they, accompanied by sheriff's deputies, thereafter took appellant out into the parking lot in handcuffs, in plain view of the assembled media. Neither event was "communicative in nature." (*Drum v. Bleau, Fox & Associates, supra,* 107 Cal.App.4th at p. 1028.) Both events were conduct, and not communication. As in *Wang v. Hartunian,* it was not the police that effected the arrest, based on information given to them by Maxfield personnel. As in *Wang v. Hartunian,* it was a citizen's arrest (effected by Maxwell).

According to the complaint, when the deputies first approached appellant, they told him that management wanted him to leave the store. It can be inferred from this[5] that Maxfield's statements to the deputies were no more than that management wanted appellant to leave the store. This did not communicate to the deputies that appellant had committed a crime. It was only after appellant indignantly refused to leave that Newson told the deputies that he wanted appellant arrested.

In the original complaint, appellant alleged that after appellant refused the deputies' request to leave, Newson told the deputies that he wanted appellant arrested for trespassing. On appeal, respondent refers to this allegation in contending that Newson was "reporting" an "incident" to the deputies. This allegation is not repeated in the first amended complaint, which only alleges that, after appellant refused to leave, Newson "told the deputies that he wanted [appellant] arrested."

■ While a damaging allegation in a superseded pleading may be considered at a later stage as a "suppressed allegation" (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 419), this is not true if the original statement was due to mistake, inadvertence, or an inadequate knowledge of the facts. (*Id.*, § 418.) ■ In the context of the facts as pleaded, and in light of the rule that we may infer facts from those expressly alleged, Newson's statement that he wanted appellant arrested for trespassing was not communicative in nature. Newson's objective was to get appellant out of the store. Newson referred to trespassing only after appellant refused the deputies' request to leave. The statement that appellant was trespassing was no more or less than what the deputies were witnessing. As in *Drum v. Bleau, Fox & Associates, supra,* 107 Cal.App.4th at page 1025, where we held that communication was tangential to the actual levy, here the object was to get appellant out of the store, not to report a crime, and the communication that took place was tangential to Maxfield's object to remove appellant from the premises.

After the foregoing, Newson arrested appellant and, as Newson was required to do under Penal Code section 847, subdivision (a), he "delivered" appellant to the deputies.[6] The facts as alleged are that Maxfield personnel

---

[5] We assume the truth of the complaint's allegations, as well as facts that may be implied or inferred from those expressly alleged. (*Atascadero v. Merrill Lynch, supra,* 68 Cal.App.4th 445, 459.)

[6] Penal Code section 847, subdivision (a) provides: "A private person who has arrested another for the commission of a public offense must, without unnecessary delay, take the person arrested before a magistrate, or deliver him or her to a peace officer."

were telling the deputies nothing more than that they wanted appellant out of the store and that, when he refused to leave, Newson, and not the deputies, arrested appellant. This was conduct on the part of Maxwell, and not communication.

Respondent contends that *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350 [7 Cal.Rptr.3d 803, 81 P.3d 244] (*Hagberg*) applies to this case, and that this decision requires that we affirm the judgment. We disagree.

In *Hagberg*, the plaintiff Hagberg attempted to deposit a check drawn by Smith Barney to her account at the California Federal Bank. The teller became suspicious about the check. This led to a phone call by the teller's supervisor, Showalter, to Smith Barney, which mistakenly informed Showalter that the check was a forgery. The bank's security manager told Showalter to call the police. This was done, and a conversation ensued during which Showalter described Hagberg and requested assistance in dealing with Hagberg and the forgery. (*Hagberg, supra,* 32 Cal.4th at p. 356.) The police dispatched officers to the bank. In the meantime, the bank's security manager learned that the check was not a forgery, and told Showalter, who was still on the phone with the police dispatcher. Showalter tried to cancel the matter with the dispatcher and, as she was doing so, saw the officers approaching Hagberg in the bank. Showalter went to the teller's window where Hagberg was and told the police that the bank had "cancelled the call." However, the officers ignored this, walked Hagberg away from the teller's window, patted her down, handcuffed her, and searched her bag. The officers asked whether Hagberg was in possession of stolen property or weapons, and whether she was driving a stolen vehicle. As Hagberg was placed under arrest by the police, the teller stated that Hagberg "looked like a criminal." Hagberg's ordeal ended 20 minutes later, when she was released. (*Ibid.*) Hagberg sued for false arrest and false imprisonment, slander, invasion of privacy, intentional infliction of emotional distress, negligence and a violation of the Unruh Civil Rights Act. (*Hagberg, supra,* at p. 357.) The Supreme Court held that section 47 barred her action.

A recitation of these facts demonstrates the substantial differences between the case at bar and *Hagberg*. In *Hagberg* there was a detailed complaint of alleged criminal conduct made to the police by Showalter. It is such communications by citizens to the police that are protected by section 47. Maxfield's statement, however, was limited to saying that management wanted appellant out of the store. In *Hagberg* it was the police who arrested the plaintiff, and did so based on information that Showalter had supplied to the police dispatcher.

Notably unlike *Hagberg*, in this case the causes of action alleged in the complaint are predicated on conduct, and not on communications to the police. This is apparent not only from the general allegations of the complaint, but also from the causes of action that are alleged. As an example, the first and second causes of action allege that the defendants "invaded [appellant's] right to privacy by parading him, handcuffed, before the media" (first cause) and that defendants "seized and arrested [appellant] and restrained him against his will and over his protest, without any warrant of arrest or any process of any kind and without any justification or cause to believe that plaintiff had committed any crime" (second cause). The fourth cause of action alleges that the defendant's *conduct* was outrageous.

Respondent also contends that the qualified privilege of subdivision (c) of section 47 applies to this case.[7] Respondent contends that "these parties shared the common interest in protecting the security of the store, preventing harassment of other shoppers, such as Ms. Lopez and Mr. Affleck, and deterring suspected criminal behavior."

This contention is without merit for two reasons. First, as noted, the causes of action asserted by appellant are based on conduct, and not on communications.

■ Second, the assertion that the defendants "shared the common interest in protecting the security of the store, preventing harassment of other shoppers, such as Ms. Lopez and Mr. Affleck, and deterring suspected criminal behavior" is outside the record of operative facts. That record is, at this stage, composed of the allegations of the first amended complaint. We disregard, as we must, assertions of fact that are not supported by the record.

Since the trial court limited its ruling to holding that section 47 bars appellant's action, we do not address questions raised by respondent that were not decided by the trial court, i.e., whether the first amended complaint is for reasons other than section 47 legally defective. Since a reversal is required, we do not address other grounds for reversal raised by appellant. (*Natter v. Palm Desert Rent Review Com.* (1987) 190 Cal.App.3d 994, 1001 [235 Cal.Rptr. 718].)

---

[7] In relevant part subdivision (c) of section 47 provides that a privileged communication is one made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment . . . ."

## DISPOSITION

The judgment is reversed. Each party is to bear his or its costs on appeal.

Rubin, Acting P. J., and Boland, J., concurred.