Filed 5/16/11

# IN THE SUPREME COURT OF CALIFORNIA

OASIS WEST REALTY, LLC,    )
               )
  Plaintiff and Respondent,  )
               )     S181781
    v.           )
               )   Ct.App. 2/5 B217141
KENNETH A. GOLDMAN et al.,   )
               )   Los Angeles County
  Defendants and Appellants. )  Super. Ct. No. SC101564
_____)

In 2004, defendant Attorney Kenneth A. Goldman agreed to represent plaintiff Oasis West Realty, LLC (Oasis) in its effort to obtain approval of a redevelopment project from the Beverly Hills City Council. Goldman terminated the representation about two years later. In 2008, Goldman became involved in a campaign to thwart the same redevelopment project by soliciting signatures on a referendum petition to overturn the Beverly Hills City Council's approval of the project. Shortly after the voters upheld the city council's approval by a very narrow margin, Oasis filed a complaint for breach of fiduciary duty, professional negligence, and breach of contract against Goldman and his law firm, Reed Smith, LLP.

1

Defendants filed a special motion to strike the complaint under the anti-SLAPP statute,[1] contending that all of Oasis's causes of action arose from Goldman's acts "in furtherance of [his] right of petition or free speech . . . in connection with a public issue."  (§ 425.16, subd. (b)(1).)  The trial court held that the anti-SLAPP statute did not apply, in that the gravamen of the causes of action was not Goldman's petitioning activity but his breach of the duties of loyalty and confidentiality, and denied the motion without considering whether Oasis had demonstrated a probability of prevailing on its claims.  The Court of Appeal reversed, finding both that Oasis's claims arose from protected activity and that Oasis had failed to demonstrate a probability of prevailing on them.  Even though the court found, and the parties agreed, that Goldman had acted adversely to his former client with respect to an ongoing matter that was the precise subject of the prior representation, the court declared that there is "no authority for a rule which would bar an attorney from doing what Goldman did here."

We disagree.  As demonstrated below, we conclude that Oasis has stated and substantiated the sufficiency of its legal claims against its former attorneys.

## BACKGROUND

In early 2004, plaintiff Oasis embarked on a plan to redevelop and revitalize a nine-acre parcel it owned in Beverly Hills by erecting a five-star hotel and luxury condominiums.  A Hilton hotel was already on the property, and the

---

[1]     SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)  In 1992, the Legislature, finding there had been "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" (Code Civ. Proc., § 425.16, subd. (a)), enacted Code of Civil Procedure section 425.16 (hereafter section 425.16) to provide a remedy against such lawsuits.

2

project is often referred to as the Hilton project. The Hilton project required the approval of the Beverly Hills City Council.

On January 26, 2004, Oasis retained defendant Attorney Kenneth A. Goldman (Goldman) and his law firm, defendant Reed Smith, LLP (Reed Smith), to provide legal services in connection with the Hilton project. According to the engagement letter, Goldman was to "have overall responsibility for this matter." Oasis has alleged that it hired Goldman "because, among other things, he was an attorney reputed to be an expert in civic matters and a well-respected, influential leader who was extremely active in Beverly Hills politics." Oasis said it believed that "Goldman's statements and opinions on City development matters bore significant influence on City Council members and the local citizenry," particularly on members of the Southwest Homeowners Association, of which he was the president.

During the representation, Goldman became "intimately involved in the formulation of the plan for Oasis'[s] development of the Property, its overall strategy to secure all necessary approvals and entitlements from the City and its efforts to obtain public support for the Project. Mr. Goldman was a key Oasis representative in dealing with Beverly Hills City Officials, including the Planning Commission and City Council. Throughout the representation, Oasis revealed confidences to Mr. Goldman, which it reasonably believed would remain forever inviolate." Reed Smith, in turn, received about $60,000 in fees. In April 2006, Goldman advised Oasis that he and Reed Smith would no longer represent Oasis in connection with the Hilton project.

Oasis's development proposal was presented to the city council in June 2006, after the representation had ended. For the next two years, the council and the city's planning commission reviewed thousands of pages of technical studies, held over 18 hearings, and received input from hundreds of community members.

3

In April 2008, the council certified the environmental impact report and adopted a General Plan Amendment Resolution and the Beverly Hilton Specific Plan Resolution with Conditions of Approval, which paved the way for final approval of the Hilton project.

Shortly thereafter, a group of Beverly Hills residents opposed to the General Plan Amendment formed the Citizens Right to Decide Committee, with the goal of putting a referendum on the ballot that would allow voters to overturn the city council's approval of the Hilton project. It was at this point that Goldman engaged in the conduct that is of concern in this proceeding.

According to the complaint, Goldman "lent his support" to the group opposing the Hilton project; "campaigned for and solicited signatures for a Petition circulated by said citizen's group that sought to abrogate the City Council's approval of the Project and instead place approval in the hands of the citizenry by proposition vote on November 4, 2008 (Measure 'H')"; and "distributed a letter seeking to cause residents of Beverly Hills to sign the Petition for the purpose of placing a referendum on the ballot, asking Beverly Hills voters to overturn approval of the Project." In a declaration filed in support of the special motion to strike, Goldman confirmed that on or about May 12, 2008, the day the city council provided final approval to the Hilton project, he and his wife walked their street to solicit signatures for the petition to overturn the council's decision. Goldman estimated that they spoke to 10 neighbors and collected five or six signatures over a period of less than an hour and a half, and that he left a note at four or five homes where there was no response.[2] Goldman estimated that through

---

[2]     The note read as follows:
                    "*LORI AND KEN GOLDMAN*
"Dear Neighbor:

*(footnote continued on next page)*

4

the couple's joint effort on May 12 as well as additional work by his wife, they managed to collect approximately 20 signatures. Goldman insisted that he at no time disclosed confidential information acquired during the representation of Oasis to anyone, and did not believe that he disclosed to anyone that he had ever represented Oasis in connection with the Hilton project.[3]

---

*(footnote continued from previous page)*

"Sorry we missed you when we stopped by.
"We stopped by to see if you would sign the Referendum Petition to overturn the City Council's recent approval of the Hilton plans. The Council approved an additional 15-story Waldorf-Astoria Hotel (where Trader Vic[']s is now), a new 16-story condo tower on the corner of Merv Griffin Way and Santa Monica and a new 6-8 story condo tower on the corner of Wilshire and Merv Griffin Way. At the last minute, the Council also allowed the developer to remove one of the floors of parking that they had previously agreed to add! And all of this in addition to the 232 condos that the Council had just finished approving on the Robinson's-May site. And all of this at one of the busiest intersections on the entire Westside!
"And all this is in the name of more and more revenue. And they don't even make any plans to seriously correct the awful intersection and lines of waiting traffic that will grow and grow.
"So we will sign the Referendum Petition and urge you to do likewise. Please call us at (310) 552-. . . to figure out a convenient time to sign. We have only 2 weeks!
"*Ken and Lori*"

[3]     Goldman also attended a city council meeting on May 6, 2008, to oppose enforcement, unsuccessfully, of the requirement that persons soliciting signatures for a referendum petition carry the full text of the resolution, including voluminous documents that had been incorporated therein. Goldman's remarks, in full, were as follows:

"Good evening members of the Council. I am here to speak on a very narrow issue concerning the Hilton that has been discussed and alluded to tonight. It is hard for me to believe that anyone in this Chamber would view it as being fair, whether you're for the Hilton or for the Referendum, to have to carry around 15 1/2 pounds of material from home to home to home to home, whether you're 15 years old or 85 years old. It's never been done. [¶] We all know it's not necessary to inform anybody to whom a petition is being presented. They don't need to read the entire EIR, the entire draft EIR, never been done. I dare say 99

*(footnote continued on next page)*

5

In a letter to Reed Smith dated May 14, 2008, Oasis criticized Goldman's conduct as a "manifest violation of both his and your firm's fiduciary obligations as our prior counsel" and demanded that Goldman and Reed Smith "immediately and unconditionally terminate and withdraw from any and all activities that may in any manner be construed as adverse to the Project, its approval or Oasis'[s] interests." Reed Smith responded by letter the same day that pending its review of these allegations, Goldman and the firm had agreed not to "engage in any actions concerning the referendum petition that is being circulated." In a letter sent the next day, Oasis insisted that "remedial action" be taken immediately to minimize further damage and proposed that Goldman and his wife ("as mutual agents of the other") "retract the letter and their support for the petition and referendum."

The citizens' committee collected the necessary signatures to place the proposed General Plan Amendment on the ballot as Measure H. Measure H, which ratified the city council's decision, was passed by voters on November 2, 2008, by a margin of 129 votes.

---

*(footnote continued from previous page)*

percent of the people in this room, whether they are for the Hilton or whether they are against the Hilton, none of them have read the entire EIR and DEIR. It's just not necessary. You can take the executive summary, you can take the resolution. [¶] I know every single one of you. I know every single one of you is fair and right and I cannot believe that you would think it is fair and right, whether you're for it or against it, to have someone, to require someone to carry that kind of material around with them when they are trying to seek whatever they are trying to seek. We've never done this before in this city, we shouldn't do it now. It's just not right; again, whether you're for the Hilton or for the Referendum. Don't require it, because it's not fair and each of the five of you knows that. It's not right. It's not necessary to inform the citizenry. There's a lot of material there. Nobody is going to read through that. Nobody that's spoken tonight, I guarantee you, I haven't read through that. Thank you."

On January 30, 2009, Oasis filed the pending lawsuit against Goldman and Reed Smith for breach of fiduciary duty, professional negligence, and breach of contract, seeking damages in excess of $4 million. Defendants filed a special motion to strike under section 425.16 on March 9, 2009. The trial court denied the special motion to strike, finding that the anti-SLAPP statute did not apply. The trial court determined that the "gravamen" of this action was Goldman's breach of his duty of loyalty and confidentiality as well as his duty to disclose adverse interests at the outset of the representation, not his solicitation of signatures for the referendum petition or speaking at the city council meeting. Because defendants had failed to make a threshold showing that the causes of action arose from protected activity, the trial court found no need to address the second step of the anti-SLAPP inquiry—i.e., whether Oasis had established a probability of prevailing at trial.

The Court of Appeal reversed in a published opinion. The court acknowledged our oft-quoted warning in *Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564, 573-574—that "an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any manner in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship"—but decided that such a "sweeping statement" applied only "in the context of subsequent representations or employment" and did not govern "the acts an attorney takes on his or her own behalf." Although Goldman "unquestionably acted against the interest of his former client, on the issue on which he was retained," the Court of Appeal found that Oasis had not stated a claim for breach of duty or violation of professional ethics, inasmuch as Goldman had not undertaken a "second attorney-client relationship or second employment of any kind" with an adverse interest,

7

was no longer representing Oasis as a current client, and had not disclosed confidential information acquired during the representation. Based on the foregoing, the court deduced that the challenged causes of action must therefore have arisen from protected conduct, concluded further that Oasis had failed to establish a probability of prevailing on its claims, and reversed the order denying defendants' anti-SLAPP motion.

## DISCUSSION

Section 425.16, subdivision (b)(1), provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." The analysis of an anti-SLAPP motion thus involves two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

Ordinarily we would proceed to consider the two prongs in order. In light of this court's "inherent, primary authority over the practice of law" (*Obrien v. Jones* (2000) 23 Cal.4th 40, 57), however, we will proceed in these particular

8

circumstances directly to the second prong, inasmuch as we have readily found that Oasis has demonstrated a probability of prevailing on its claims.

To satisfy the second prong, "a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility, [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.) If the plaintiff "can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless" and will not be stricken; "once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 106, original italics.)

We shall consider the causes of action for breach of fiduciary duty, professional negligence, and breach of contract together, as all three claims are based on Goldman's alleged breach of his duties as former counsel to Oasis. The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages. (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1509.) The elements of a cause of action for professional negligence are (1) the existence of the duty of the

9

professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence. (*Ibid.*) And the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff. (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830.)

The complaint identifies a number of acts of alleged misconduct and theories of recovery, but for purposes of reviewing the ruling on an anti-SLAPP motion, it is sufficient to focus on just one. Oasis contends that Goldman, as its lawyer, was "a fiduciary . . . of the very highest character" and bound "to most conscientious fidelity—*uberrima fides*." (*Cox v. Delmas* (1893) 99 Cal.104, 123.) Among those fiduciary obligations were the duties of loyalty and confidentiality, which continued in force even after the representation had ended. (*Wutchumna Water Co. v. Bailey*, *supra*, 216 Cal. at pp. 573-574.) As we have previously explained, "[t]he effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. [Citation.] The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship." (*People ex rel. Dept. of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1146-1147.) Accordingly, "an attorney is forbidden to do either of two things after severing [the] relationship with a former client. [The attorney] may not do anything which will injuriously affect [the] former client in any matter in which [the attorney] formerly represented [the client] nor may [the attorney] at any time use against [the] former client knowledge or information acquired by virtue of the previous relationship."

10

(*Wutchumna Water Co.*, *supra*, 216 Cal. at pp. 573-574; see *People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 155 [quoting *Wutchumna Water Co.*]; *Brand v. 20th Century Ins. Co./21st Century Ins. Co.* (2004) 124 Cal.App.4th 594, 602 [same].)

Oasis contends that defendants violated this prohibition in a number of ways. Oasis asserts in particular that Goldman acquired confidential and sensitive information relating to the Hilton project through the course of the representation (see also *People ex rel. Deukmejian v. Brown*, *supra*, 29 Cal.3d at p. 156 [a presumption that confidences were disclosed arises from the existence of the attorney-client relationship]), particularly during team meetings that discussed matters of strategy with respect to the city council, other city officials, and civic organizations, and that Goldman then *used* this information when he actively opposed the precise project he had been retained to promote. Although Oasis does not offer direct evidence that Goldman relied on confidential information in formulating his opposition or in crafting his plea to his neighbors to join him in opposing the project, the proper inquiry in the context of an anti-SLAPP motion "is whether the plaintiff proffers sufficient evidence for such an inference." (*Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1021, disapproved on another ground in *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065.) In light of the undisputed facts that Goldman agreed to represent Oasis in securing approvals for the project, acquired confidential information from Oasis during the course of the representation, and then decided to publicly oppose the very project that was the subject of the prior representation, it is reasonable to infer that he did so. Moreover, inasmuch as Goldman was obligated under rule 3-310(B) of the State Bar Rules of Professional Conduct to disclose to Oasis any personal relationship or interest that he knew or reasonably should have known could substantially affect the exercise of his professional judgment—but never did

11

so—it is likewise reasonable to infer that Goldman's opposition to the project developed over the course of the representation, fueled by the confidential information he gleaned during it. Oasis further claims that, because of Goldman's overt acts in opposition to the project, it was forced to investigate Goldman's conduct and prepare a letter demanding defendants' adherence to their legal and fiduciary duties, thereby incurring over $3,000 in legal fees. Based on this showing and the inferences therefrom, we conclude that Oasis has demonstrated a likelihood of prevailing on each of its three causes of action.

Defendants offer a number of arguments as to why the causes of action are neither legally or factually sufficient, but none of them is persuasive.

Defendants argue first that the duty we outlined in *Wutchumna Water Co. v. Bailey*, *supra*, 216 Cal. 564 is overbroad and should be read to apply in only two specific circumstances: (1) where the attorney has undertaken a concurrent or successive representation that is substantially related to the prior representation and is adverse to the former client, or (2) where the attorney has disclosed confidential information. The Court of Appeal explicitly limited the duty to these two circumstances based solely on the fact that "all the cases which recite this rule do so in the context of subsequent representations or employment," and in those cases the attorney's duties to the new client would otherwise conflict with the attorney's duties to the former client. But neither defendants nor the Court of Appeal offer any justification for limiting an attorney's duty to a former client in this manner, especially where the attorney has used the former client's confidential information to actively oppose the former client with respect to an ongoing matter that was the precise subject of the prior representation. It is well established that the duties of loyalty and confidentiality bar an attorney not only from using a former client's confidential information in the course of "making decisions when representing another client," but also from "taking the information significantly

12

into account in framing a course of action" such as "deciding whether to make a personal investment"—even though, in the latter circumstance, no second client exists and no confidences are actually disclosed. (Rest.3d, Law Governing Lawyers, § 60, com. c(i), p. 464.)

It is not difficult to discern that use of confidential information against a former client can be damaging to the client, even if the attorney is not working on behalf of a new client and even if none of the information is actually disclosed. For example, an attorney may discover, in the course of the representation of a real estate developer, that city officials are particularly concerned about the parking and traffic impacts of a proposed development, or that an identifiable population demographic is especially disposed to oppose the proposed development. Under the interpretation proposed by defendants and adopted by the Court of Appeal, the attorney would be free to terminate the representation of the developer and use this information to campaign (quite effectively, one would imagine) against the precise project the attorney had previously been paid to promote. Inasmuch as the harm to the client is the same, the rule appropriately bars the attorney from *both* disclosing *or* using the former client's confidential information against the former client. (*People ex rel. Deukmejian v. Brown*, *supra*, 29 Cal.3d at p. 156.) Indeed, the same rule prevails in most jurisdictions, as evidenced by the Restatement Third of the Law Governing Lawyers, section 60: "(1) Except as provided in §§ 61-67, during and after representation of a client: [¶] (a) the lawyer may not use or disclose confidential client information . . . if there is a reasonable prospect that doing so will adversely affect a material interest of the client . . . ." (See also Rest.3d, Law Governing Lawyers, § 60, com. c(i), p. 464 ["Both use and disclosure adverse to the client are prohibited"]; Assn. of Bar of City of New York, Com. on Prof. & Jud. Ethics, Formal Opn. No. 1997-3, *Lawyer's Right to Engage in Activity or Express a Personal Viewpoint Which Is Not in Accordance*

13

*with a Client's Interests* ["a lawyer may not, in the course of discussing his or her view on a public issue, misuse or reveal a client confidence"].)

*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, on which the Court of Appeal relied, is plainly distinguishable. In that case, we held that attorneys employed in the public sector, who exercise their statutory right to sue their public agency employer to resolve disputes regarding wages or other conditions of employment, do not thereby violate their duty of loyalty. (*Id*. at p. 553.) The attorneys' lawsuit on their own behalf, unlike the situation here, did not present a conflict with the client on matters in which the attorneys represented the county (*id*. at p. 546), and we emphasized that "attorneys in such circumstances are held to the highest ethical obligations to continue to represent the client in the matters they have undertaken, and that a violation of their duty to represent the client competently or faithfully, or of any other rule of conduct, will subject those attorneys to the appropriate discipline, both by the employer and by the State Bar." (*Id*. at p. 553.)

Defendants' contention that they were somehow relieved of their duties of loyalty and confidentiality by section 125 of the Restatement Third of the Law Governing Lawyers is mistaken. A comment to that provision explains that "[*i*]*n general*, a lawyer may publicly take personal positions on controversial issues without regard to whether the positions are consistent with those of some or all of the lawyer's clients. . . . For example, if tax lawyers advocating positions about tax reform were obliged to advocate only positions that would serve the positions of their present clients, the public would lose the objective contributions to policy making of some persons most able to help. [¶] *However*, a lawyer's right to freedom of expression is modified by the lawyer's duties to clients. . . . *The requirement that a lawyer not misuse a client's confidential information (see § 60) similarly applies to discussion of public issues*." (Rest.3d, Law Governing

14

Lawyers, § 125, com. e, p. 315, italics added; see also *id*., § 33(2), p. 240 ["Following termination of a representation, a lawyer must:[¶] . . . [¶] (d) take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation"].)

An illustration in the Restatement discussion of section 125 demonstrates the distinction: "Lawyer represents Corporation in negotiating with the Internal Revenue Service to permit Corporation to employ accelerated depreciation methods for machinery purchased in a prior tax year. At the same time, Lawyer believes that the accelerated depreciation laws for manufacturing equipment reflect unwise public policy. Lawyer has been working with a bar-association committee to develop a policy statement against the allowance, and the committee chair has requested Lawyer to testify in favor of the report and its proposal to repeal all such depreciation allowances. Any new such legislation, as is true generally of such tax enactments, would apply only for current and future tax years, thus not directly affecting Corporation's matter before the IRS. Although the current legislation would be against Corporation's economic interests, Lawyer may, without Corporation's consent, continue the representation of Corporation while working to repeal the allowance." (Rest.3d, Law Governing Lawyers, § 125, com. e, illus. 6, p. 316.) Defendants' alleged conduct here is not analogous to "Lawyer's" efforts to repeal depreciation allowances in the future. What Oasis alleges here, in the terms of the analogy above, is that Lawyer, after obtaining IRS approval of the depreciation allowance, withdrew and then, on Lawyer's own behalf, sought to have "Corporation's" depreciation allowance *for that prior tax year* overturned and used confidential information to make that case. Defendants have not identified any authority to countenance such conduct, and our own research has uncovered none.

15

Defendants complain that a "broad categorical bar on attorney speech" would lead to a parade of horribles. They warn that a lawyer would be prevented even from voting in an election against the former client's interest and that the prohibition would necessarily extend to every attorney in an international law firm. It seems doubtful that a single vote in a secret ballot in opposition to a client's interest would offer "a reasonable prospect" of "adversely affect[ing] a material interest of the client." (Rest.3d, Law Governing Lawyers, § 60(1)(a).) In any event, we are not announcing a broad categorical bar here, nor are we presented with a situation requiring us to articulate how imputed disqualification rules would apply in this context. Our task is solely to determine whether any portion of Oasis's causes of action have even minimal merit within the meaning of the anti-SLAPP statute. A claim that Goldman used confidential information acquired during his representation of Oasis in active and overt support of a referendum to overturn the city council's approval of the Hilton project, where the council's approval of the project was the explicit objective of the prior representation, meets that low standard.

The absence of a "broad categorical bar on attorney speech" also disposes of defendants' attempt to interpose a First Amendment defense. Defendants assert that "preventing client suspicions that their former attorneys will use confidential information . . . is not a compelling state interest." But the claim before us, under the second step of the anti-SLAPP analysis, does not propose a "broad prophylactic prohibition[] of political speech" to guard against a mere "suspicion without proof" that Goldman may have used confidential information. Rather, as demonstrated above, Oasis has presented a prima facie case that Goldman *did* use confidential information, to the detriment of his former client, with respect to the precise subject of the prior representation. Defendants have cited no authority to suggest the First Amendment would protect such duplicity. (See generally *Gentile*

16

*v. State Bar of Nevada* (1991) 501 U.S. 1030, 1081-1082 (conc. opn. of O'Connor, J.) ["Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech"]; cf. *American Motors Corp. v. Huffstutler* (Ohio 1991) 575 N.E.2d 116, 120 [" '[t]here is no constitutional bar to the issuance of an injunction against unlawful use of confidential business information' "].)

The Court of Appeal cited *Johnston v. Koppes* (9th Cir. 1988) 850 F.2d 594, but the case is not helpful to defendants. In *Johnston*, an attorney employed by the State Department of Health Services attended a legislative committee hearing on the subject of the use of state funds for abortion. The attorney, whose views on that subject diverged from those of the office that employed her, did not speak at the hearing or communicate her views in any manner, but the department nonetheless demoted her and transferred her to another section. (*Id.* at p. 595.) In the course of upholding the denial of the department's motion for summary judgment as to the attorney's cause of action under 42 United States Code section 1983, the Ninth Circuit stated that "[l]oyalty to a client requires subordination of a lawyer's personal interests when acting in a professional capacity. But loyalty to a client does not require extinguishment of a lawyer's deepest convictions; and there are occasions where exercise of these convictions—even an exercise debatable in professional terms—is protected by the Constitution." (*Johnston, supra*, 850 F.2d at p. 596.) Inasmuch as there was no allegation that the attorney acted in any way against the department as to a specific and ongoing matter on which she was then representing or had previously represented the department, nor was there any allegation that she had used or disclosed confidential information acquired by virtue of her employment, *Johnston* does not suggest that the conduct alleged by Oasis would be protected by the Constitution.

17

Finally, we conclude that Oasis has set forth a prima facie case of actual injury and entitlement to damages. Oasis asserts that because of Goldman's active and overt opposition to the Hilton project, it was compelled to protect its rights by retaining legal counsel to prepare a letter demanding that Goldman cease and desist from further misconduct. The cost of this remediation exceeded $3,000. It is "the established rule that attorney fees incurred as a direct result of another's tort are recoverable damages." (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 751.) In particular, recoverable damages include "the expense of retaining another attorney" when reasonably necessary to "attempt to avoid or minimize the consequences of the former attorney's negligence." (3 Mallen & Smith, Legal Malpractice (2011 ed.) § 21:6, p. 23; see also *id.*, § 21:10, p. 34 ["A client may incur attorneys' fees and litigation expenses in attempting to avoid, minimize, or reduce the damage caused by attorneys' wrongful conduct"].)

Based on the respective showings of the parties, we conclude that Oasis's claims for breach of fiduciary duty, professional negligence, and breach of contract possess at least minimal merit within the meaning of the anti-SLAPP statute. On this ground, we therefore reverse the judgment of the Court of Appeal.

**DISPOSITION**

The judgment of the Court of Appeal is reversed.

BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

**CONCURRING OPINION BY KENNARD, J.**


Plaintiff Oasis West Realty, LLC (Oasis), hired attorney Kenneth A. Goldman and his law firm to assist Oasis in obtaining local government approval for a redevelopment project. About two years later, Goldman terminated the representation, and about two years after that, Goldman became involved in a public campaign *opposing* the very same redevelopment project. Specifically, Goldman solicited signatures for a petition to overturn the local government's approval of the project. Oasis then sued Goldman and his law firm for breach of fiduciary duty, professional negligence, and breach of contract. Defendants moved to strike the complaint under Code of Civil Procedure section 425.16, which establishes a special procedure for early dismissal of SLAPP lawsuits, which are suits based on the defendant's exercise of the right of petition or speech in connection with a public issue. SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) The trial court denied defendants' anti-SLAPP motion, and the Court of Appeal reversed.

I concur in the majority's decision to reverse the judgment of the Court of Appeal, and I agree with most of the majority's reasoning. Unlike the majority, however, I would not bypass the first step of the anti-SLAPP analysis.

The majority correctly explains: "The analysis of an anti-SLAPP motion . . . involves two steps. 'First, the court decides whether the defendant has

1

made a threshold showing that the challenged cause of action is one "arising from" protected activity. ([Code Civ. Proc.,] § 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.)" (Maj. opn., *ante*, at p. 8.) The majority, however, skips the first step of that analysis. The majority states: "Ordinarily we would proceed to consider the two prongs in order. In light of this court's 'inherent, primary authority over the practice of law' (*Obrien v. Jones* (2000) 23 Cal.4th 40, 57), however, we will proceed in these particular circumstances directly to the second prong, inasmuch as we have readily found that Oasis has demonstrated a probability of prevailing on its claims." (Maj. opn., *ante*, at pp. 8-9.)

I agree that Oasis has demonstrated a probability of prevailing on its claims. But I do not share the majority's view that simply because Oasis's lawsuit concerns Goldman's duties as an attorney and this court has "inherent, primary authority over the practice of law" (*Obrien v. Jones*, *supra*, 23 Cal.4th at p. 57), this court can readily dispense with the first step of the anti-SLAPP analysis and proceed directly to the second step. The majority's approach would not be available to a Court of Appeal or a superior court, neither of which has primary authority over the practice of law.

The majority's approach is particularly surprising here, because defendants have *easily* made the necessary showing that the action by Oasis is based on Goldman's exercise of his constitutional right to free speech in connection with a public issue. Subdivision (e) of Code of Civil Procedure section 425.16 defines the phrase " 'act in furtherance of a person's right of . . . free speech . . . in connection with a public issue' " to include "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized

2

by law." Here, Goldman solicited signatures for a petition to overturn a local government's approval of a redevelopment project. It is hard to imagine conduct that more squarely fits the definition set forth in subdivision (e), and Oasis's lawsuit is based directly on that conduct. If Goldman had not exercised his free speech rights in support of the petition — if instead he had kept his views to himself — the alleged injury to Oasis would not have occurred, and Oasis would have had no basis for a lawsuit against Goldman and his law firm.

This is not to suggest that constitutional protections of speech permitted Goldman to speak against the Oasis project with impunity. As an attorney, Goldman's right to free speech was restricted insofar as it was adverse to a former client and concerned the same subject matter as the former representation. (See maj. opn., *ante*, at pp. 16-17.) But the fact remains that Oasis's lawsuit is based on Goldman's exercise of the right of speech, and therefore the anti-SLAPP statute applies. To invoke that statute, a defendant need not go so far as to establish that the relevant speech or petition activity is constitutionally protected as a matter of law; if that were the rule, " 'then the [secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, quoting *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305.) Rather, the defendant need only show the existence of a legitimate issue as to whether the speech or petition activity is constitutionally protected. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 311-320.)

I conclude that defendants here made the showing necessary to satisfy the first inquiry in the anti-SLAPP analysis, a step bypassed by the majority. Regarding the second inquiry, however, I agree with the majority that Oasis has shown a probability of prevailing, and therefore the trial court was correct to deny

defendants' anti-SLAPP motion.  Accordingly, I concur in the majority's judgment.

KENNARD, J.

I CONCUR:

TODD, J.*

---

\*      Associate Justice, Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Oasis West Realty, LLC v. Goldman
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 182 Cal.App.4th 688
**Rehearing Granted**

_____

**Opinion No.** S181781
**Date Filed:** May 16, 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Norman P. Tarle

_____

**Counsel:**

Akins Gump Strauss Hauer & Feld, Rex S. Heinke, Jessica M. Weisel; Fairbank & Vincent, Dirk L. Vincent and Michael B. Norman for Defendants and Appellants.

Rosoff, Schiffres & Barta, Robert M. Barta, Howard L. Rosoff, H. Steven Schiffres; Esner & Chang, Esner, Chang & Boyer, Stuart B. Esner and Andrew N. Chang for Plaintiff and Respondent.

Lawrence J. Fox as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Rex S. Heinke
Akins Gump Strauss Hauer & Feld
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3012
(310) 229-1000

H. Steven Schiffres
Rosoff, Schiffres & Barta
11755 Wilshire Boulevard, Suite 1450
Los Angeles, CA  90025
(310) 479-1454