Filed 7/1/13  Brown v. Technology Properties CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHESTER A. BROWN, JR., et al.,<br><br>    Plaintiffs, Cross-Defendants, and Respondents,<br><br>v.<br><br>TECHNOLOGY PROPERTIES LIMITED, LLC, et al.,<br><br>    Defendants, Cross-Complainants and Appellants. | H037664<br>(Santa Clara County<br>Super. Ct. No. 1-09-CV-159452) |

Technology Properties Limited, LLC (TPL) and its principal, Daniel Leckrone, appeal from an order striking two causes of action in their cross-complaint against plaintiffs Chester and Marcie Brown.  Defendants contend that the superior court improperly applied Code of Civil Procedure section 425.16[1] in striking these claims because they did not fall within the statutory description of a "strategic lawsuit against public participation" (SLAPP).  We find no error and must therefore affirm the order.

---

[1]  All further statutory references are to the Code of Civil Procedure unless otherwise specified.

*Background*

Defendant Leckrone, an attorney, founded TPL and was its chairman. Chester A. Brown, Jr. (Brown) was at various times a consultant to and an employee of TPL, as well as an investor of patent portfolios of which TPL had the right to commercialize. In 1999 Leckrone was seeking funding for the commercialization of a portfolio of "Hearing Health Care" (HHC) patents. Brown and his wife, Marcie Brown, invested $50,000 in the HHC portfolio, in exchange for one percent of the gross proceeds of any licensing of the portfolio. Plaintiffs invested another $50,000 in 2000 and again in 2001. In May 2003 Brown became a consultant to TPL under a Consulting Agreement, under which he served as Chief Operating Officer of Leckrone's newly formed entity, AsyncArray Devices (AAD), in order to develop and commercialize a new microprocessor device, which later became known as the SEAforth microprocessor. Eventually the name of AAD was changed to IntellaSys Corporation. In 2006 Brown became an IntellaSys employee, serving as Chief Executive Officer (CEO). In September of 2006 IntellaSys was merged into TPL, but Brown continued to serve as CEO of the IntellaSys division.

In August 2003 plaintiffs agreed to contribute another $25,000 for the HHC portfolio. This time the consideration was 3.5 percent of the gross proceeds of the licensing of both the HHC portfolio and another portfolio, consisting of Moore Microprocessor Patents (MMP) based on technology developed by Charles Moore and Russell Fish. Leckrone drafted the resulting contract, the Assignment Agreement, which TPL and both plaintiffs executed in early 2004, but which was backdated to August 4, 2003.

Plaintiffs received payments from TPL under the Assignment Agreement covering the period through March 2007. After June 2007, however, they received nothing. When Brown inquired about the failure to make further payments, Leckrone and TPL's senior vice-president told him that TPL had no money.

2

Plaintiffs filed a complaint against TPL and Leckrone in December 2009, alleging, among other things, breach of the Assignment Agreement. On March 1, 2010, defendants answered and filed a cross-complaint. Among the causes of action in the cross-complaint was specific performance of a separate contract on January 15, 2009. Defendants alleged that the SEAforth technology was to be transferred to a new company, Newco, which Brown and other IntellaSys employees would control and in which TPL would have a minority position. Brown had allegedly prepared a letter of intent which was accepted by TPL and was incorporated into a "Master Agreement." Under this contract, Brown was to have "an interest in Newco in exchange for any sums owed to [*sic*] per the Assignment." TPL had performed its promises, but Brown had not complied with his obligations, "including the cancellation of the Assignment."

A bench trial took place in November 2010, limited to (1) the interpretation of section 2.1 of the Assignment Agreement, and in particular the term "Gross Proceeds" in that provision; and (2) the ability of TPL to modify or amend the Assignment Agreement without a writing. On the latter issue, the court determined in July 2011 that amendment was not precluded by a provision of the agreement restricting assignment.

Meanwhile, on June 15, 2011, the court granted TPL leave to file a first amended cross-complaint. This pleading asserted multiple causes of action, including breach of contract. TPL alleged that Brown himself had proposed a "Management Buyout" in which he would acquire the SEAforth Division of IntellaSys in consideration for TPL's minority equity interest, "as well as a release of certain claims, including specifically any claims the Browns had under the parties' Assignment Agreement entitling the Browns to a percentage interest in certain licensing proceeds from the MMP patent portfolio referred to at that time as their 'TPL accrual.' " The transaction was finalized, according to the cross-complaint, on January 15, 2009, when TPL delivered the personnel and assets of the SEAforth Division to Brown. TPL then "continued to fully and faithfully discharge its obligations" by passing sales leads on to Brown, and maintaining telephone, email,

3

and website access and support.  In December 2009, however, "the Browns announced their intention to renounce, abandon, and breach their obligations under the agreement by filing a lawsuit against TPL to enforce the claims under the parties' Assignment Agreement that they had relinquished in consideration of TPL's acceptance of their Management Buyout proposal and by announcing Mr. Brown's intention to limit his involvement in the management of the going concern."

The cause of action for breach of contract narrowed the focus of Brown's alleged failings.  TPL stated that the parties had an "oral agreement which was reduced to writing," in which Brown agreed to act as CEO of the "going concern" and to "relinquish, individually and  . . . on behalf of his wife, Marci[e] Brown, any amount they were owed by TPL, if any."  The key allegation of the first cause of action is the assertion of breach: "Despite agreeing to and accepting the benefits of the Management Buyout agreement, the Browns subsequently repudiated the agreement by filing this lawsuit to recover monies from TPL that the Browns had agreed to relinquish as part of the agreement, their so-called 'TPL accrual.' "

Similarly, the sixth cause of action alleged promissory estoppel arising from Brown's promise that he would act as CEO and that both he and Marcie would "relinquish any amount they were owed by TPL, if any."  In "reasonable reliance" on this promise, TPL gave up other marketing opportunities and "promptly turned over control of the SEAforth Division of IntellaSys and all of its operational assets to Mr. Brown and over the following weeks and months provided Mr. Brown and his team with sales leads and other support," including proprietary information.  The key allegation in this cause of action was the following:  "Despite TPL's performance, by filing their lawsuit against TPL to recover amounts that they represented and promised they had relinquished any claim to, the Browns have failed to honor and fulfill their promises to TPL and injustice can only be avoided by enforcing the Browns' promises and representations to TPL."

4

The remaining allegations of the first amended cross-complaint were for intentional and negligent misrepresentation, intentional and negligent interference with the economic relationship between TPL and Moore, misappropriation of trade secrets, unfair competition, and conversion. These claims were premised on the alternative contingency that no agreement was actually reached in January 2009. Instead, Brown was alleged to have misrepresented his intention to enter into such a relationship; and by failing to honor his promises, he disrupted TPL's negotiations with Moore and other third parties. Finally, TPL sought declaratory relief to determine the rights and obligations of the parties with respect to the Management Buyout, particularly the Browns' liability to TPL.

Plaintiffs answered the first amended cross-complaint and then filed a motion to strike each cause of action under section 425.16, the anti-SLAPP statute. Plaintiffs argued that the entire cross-action arose from the plaintiffs' protected right to petition, because defendants were alleging repudiation of a contract by plaintiffs' filing of their lawsuit. They further disputed defendants' ability to prevail on their claims. In opposition, defendants insisted that their complaint arose from the conduct of the parties in January 2009, not from plaintiffs' December 2009 complaint.

On September 27, 2011, following written and oral argument, the superior court issued its order granting the motion in part. The court agreed with plaintiffs that the first (breach of contract) and sixth (promissory estoppel) causes of action arose out of protected activity and that defendants had failed to demonstrate a probability of prevailing. As to the remaining claims, the court denied the motion. Defendants filed this timely appeal.[2]

---

[2] After defendants filed their notice of appeal, the superior court declined to stay the proceedings and the matter proceeded to trial before a jury. On April 18, 2012, the jury found TPL liable for breach of the Assignment Agreement. The jurors answered "no" when asked whether plaintiffs had waived their rights to any funds under that agreement,

*1. Scope and Standard of Review*

Both parties appear to understand the nature of section 425.16 and the legislative intent underlying its enactment. "A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 21; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1126.) Section 425.16 was enacted in 1992 to address the "disturbing increase" in the frequency of these meritless harassing lawsuits. (§ 425.16, subd. (a); see *Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1; *Simpson Strong-Tie Company, Inc. v. Gore*, *supra*, 49 Cal.4th at p. 21.) It was the Legislature's finding "that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." (§ 425.16, subd. (a).) The statute was thus designed to deter meritless actions that "deplete 'the defendant's energy' and drain 'his or her resources,' [citation], . . . ' ". . . by ending them early and without great cost to the SLAPP target" ' [citation]." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278; *Chabak v. Monroy* (2007)

and they rejected defendants' affirmative defenses of unclean hands and accord and satisfaction. They further found that the parties had never agreed to the terms of the alleged oral January 15, 2009 contract, that Brown had not made a false representation or a promise that was important to the transaction, nor that he had caused any disruption of the relationship between TPL and Moore. They did find misappropriation of trade secrets, but damages amounted to zero.

154 Cal.App.4th 1502.) The challenged cause of action may appear in a complaint, in a cross-complaint, or in other pleadings. (§ 425.16, subd. (h); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 77 (*Cotati*).)

In evaluating a motion under the statute the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Cotati*, *supra*, 29 Cal.4th at p. 76; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute— i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89.) We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at p. 269, fn. 3; *Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 820.)

*2. Protected Activity: Right of Petition*

The first step of the section 425.16 analysis is to determine whether the challenged cause of action was one arising from protected activity. It is the burden of the party seeking the protection of the statute (the defendant, or, in this case, plaintiffs as cross-defendants) to show that the challenged cause of action falls within the statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66 (*Equilon*); accord, *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) Accordingly, the conduct at issue must fall within one of the four categories set forth in subdivision (e) of section 425.16: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

7

authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e).)

"As courts applying the anti-SLAPP statute have recognized, the 'arising from' requirement is not always easily met." (*Equilon, supra,* 29 Cal.4th at p. 66.)  "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.  [Citation.] Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail [*sic*] that it is one arising from such.  [Citation.]  In the anti-SLAPP context, the critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89; *In re Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.)  Moreover, "a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. . . . [W]hen the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez v. Metabolife Intern., Inc.* (2003) 113 Cal.App.4th 181, 188.)

Defendants' primary contention on appeal is that a compulsory cross-complaint such as theirs cannot be subject to scrutiny as a potential SLAPP.  Even assuming, however, that their pleading was in fact a compulsory cross-complaint,[3] it was not

---

[3] A claim that is not pleaded in a cross-complaint is forfeited if it is a "related cause of action"—that is, it arises "out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint."  (§§ 426.10, subd. (c), 426.30, subd. (a).)  "Because of the liberal

8

automatically exempt from the reach of the anti-SLAPP statute. (See *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1373 [rejecting assertion that compulsory cross-complaint can never be subject to an anti-SLAPP motion].) It is the "principal thrust or gravamen" of the claim that determines whether section 425.16 applies. (*Martinez v. Metabolife Internat. Inc., supra,* 113 Cal.App.4th at p. 188, citing *Cotati*, *supra*, 29 Cal.4th at p. 79; *Navellier*, *supra*, 29 Cal.4th at pp. 92-93.) Here, the gravamen of defendants' allegations in the first and sixth causes of action was not that plaintiffs simply failed to perform under the Management Buyout agreement, but that they actively *repudiated* the agreement and broke their promise specifically "by filing their lawsuit against TPL" for breach of the earlier contract, the Assignment Agreement. The conduct alleged in the cross-complaint thus arose from plaintiffs' act of filing their complaint, a protected activity. (Cf. *Navellier*, *supra*, 29 Cal.4th at p. 90 [complaint subject to section 425.16 where it alleged repudiation by filing federal action, contrary to release of claims].)

*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 924–925 does not instruct otherwise. In that case the trial court granted the plaintiff's anti-SLAPP motion as to one cause of action in the defendant city's cross-complaint; in that cause of action the city had alleged a violation of the False Claims Act, based on the filing of the plaintiff's underlying complaint. The striking of that cause of action was *not* challenged on appeal. As the remaining claims were not based on the

construction given to the statute to accomplish its purpose of avoiding a multiplicity of actions, 'transaction' is construed broadly; it is 'not confined to a single, isolated act or occurrence . . . but may embrace a series of acts or occurrences logically interrelated [citations].' [Citations]." (*Align Technology, Inc. v. Bao Tran* (2009) 179 Cal.App.4th 949, 960.) "In the breach of contract context, the rule means [that] any claims the defendant has against the plaintiff based on the same contract generally must be asserted in a cross-complaint, even if the claims are unrelated to the specific breach or breaches that underlie the plaintiff's complaint." (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 538.)

plaintiff's litigation activity, the motion was properly denied.  (*Id*. at p. 930 & fn. 5.)

Clearly *Kajima* has no application to this case.  Nor does *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628 (disapproved of on another ground in *Equilon, supra,* 29 Cal.4th 53), cited in *Kajima*, support defendants' position.  Wollersheim in fact specifically noted that a cross-complaint may be subject to a section 425.16 motion, although "[o]nly those cross-complaints alleging a cause of action *arising* from the plaintiff's act of filing the complaint against the defendant and the subsequent litigation would potentially qualify as a SLAPP action."  (42 Cal.App.4th at p. 651.)

Here, as discussed above, the first and sixth causes of action in the cross-complaint specifically identified plaintiffs' act of filing the lawsuit as the basis for the alleged wrong.  Defendants nevertheless recharacterize their allegations as complaining of conduct that "began nearly a year before the Browns filed their lawsuit. "  According to defendants, the "mention" of the lawsuit in the cross-complaint was "incidental," as it only identified "the point at which the Browns finally made absolutely clear 'their intention to renounce, abandon and breach their obligations under the [January 2009 Management Buyout Agreement].' "  Defendants, however, have not pointed to a specific act by Brown or Marcie Brown that constituted a breach of their promise before the filing of the lawsuit.  The "intention" itself was not actionable; and whatever act constituted the actual renouncement had to have occurred shortly after the agreement was reached in order to have been "nearly a year before" the lawsuit.  Defendants refer us to nothing in the record from which we can infer that the first and sixth causes of action were based on conduct other than what the pleading plainly stated:  that plaintiffs failed to honor their promissory obligation "by filing their lawsuit against TPL."  The superior court therefore did not err in determining that plaintiffs met their initial burden to show that these two claims arose from an act in furtherance of plaintiffs' "right of petition" as defined in section 425.16, subdivision (e).  Accordingly, we must turn next to the second step of the

10

SLAPP analysis: whether defendants met their responsive burden to show a probability of prevailing on the stricken causes of action.

*3. Probability of Prevailing*

To satisfy the second prong of the SLAPP analysis, "a plaintiff responding to an anti-SLAPP motion must " ' " 'state[ ] and substantiate[ ] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility, [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' [Citation.] If the plaintiff 'can show a probability of prevailing on any part of its claim, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

Here the causes of action were for breach of contract and promissory estoppel. Establishing the first cause of action would have required a showing of "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Id*. at p. 821, citing *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830.) Defendants contend that they submitted evidence of both the January 2009 agreement and Brown's breach. The evidence they point to, however, established that no January 2009 contract ever existed. Leckrone's own declaration referred to an unsigned letter of intent and the bare statement that the buyout proposal had been "reduced to writing." Not only did defendants produce no

11

written agreement signed by both plaintiffs, there was no evidence supporting even an inference of mutual assent. Defendants suggest that an e-mail correspondence evinces an agreement reached by January 15, 2009. The correspondence proffered by the parties instead reveals the opposite, that the parties had not agreed on the terms even as late as May 2009. Likewise, the printed copy of a PowerPoint presentation by TPL on January 15, 2009 indicates nothing more than a meeting at which proposed details of the SEAforth spinoff were discussed. None of the evidence indicates that the parties mutually assented to a term providing for the relinquishment by both plaintiffs of their accrual rights under the prior Assignment Agreement. Leckrone himself testified at his deposition that he did not believe that the rights and obligations of the Assignment Agreement had been extinguished in any way.[4] And in early February he went to plaintiffs' home and unsuccessfully tried to persuade them to agree to a draft of an agreement between TPL, Brown, and Moore.[5] Moore himself did not sign such an agreement; and by February 2009, independent of any conduct of Brown, he had discontinued negotiations with TPL.

In short, the trial court ruled correctly that there was no contract providing for plaintiffs' relinquishment of their accrual rights under the Assignment Agreement. The lack of mutual assent, however, does not foreclose a showing of promissory estoppel. To succeed in that cause of action defendants would have had to show a "clear and unambiguous" promise, reasonable and foreseeable reliance by the party to whom the

---

[4] Plaintiffs note that TPL continued to keep the amounts owed to plaintiffs on its records as a liability.

[5] Leckrone described this meeting as an effort to "encourage [Brown] to stop obstructing the on-going [*sic*] implementation planning discussions with Mr. Moore." Although Leckrone reported that Marcie Brown "showed interest," her uncontradicted declaration established that she never agreed to any transaction in which she would give up her rights under the Assignment Agreement, nor that she authorized her husband to do so on her behalf.

12

promise is made, and injury resulting from that reliance. (*US Ecology, Inc. v. State* (2005) 129 Cal.App.4th 887, 901; accord, *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 513; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 897.) While this cause of action lacks the contractual element of consideration, it nonetheless involves a *promise*. (See *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 247.) As discussed above, however, there was no evidence that either Chester or Marcie Brown promised to relinquish their accrual rights under the Assignment Agreement. Consequently, defendants necessarily failed to show a probability of prevailing on this cause of action as well.

We thus conclude that the superior court properly struck the first and sixth causes of action in defendants' first amended cross-complaint. Plaintiffs met their burden to show that the key allegations of these causes of action arose from plaintiffs' act of filing their action against defendants, clearly an act in furtherance of their right of petition within the meaning of section 425.16. Having failed to show a probability of prevailing, defendants were properly foreclosed from proceeding on these claims.

### Disposition

The order is affirmed. Plaintiffs are entitled to their costs on appeal.

13

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.