Filed 12/30/25  Thee Aguila v. Investel Two CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THEE AGUILA, INC., | B341343 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV15388) |
| v. | |
| INVESTEL TWO, LLC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steve Cochran, Judge.  Affirmed.

The Tym Firm and Ronald D. Tym, for Plaintiff and Appellant.

Law Offices of Robert S. Altagen and Robert S. Altagen; Michael Allison, for Defendant and Respondent.

# INTRODUCTION

In 2016, Thee Aguila, Inc. (TAI) entered into a contract to purchase a property from Investel Two, LLC. TAI also leased the property while the sale was pending. The property included a building on a parcel that the parties agreed would be subdivided. In 2016 and 2017, the building was damaged. TAI collected insurance payments from its own insurer for the damages and loss of use. Investel also submitted insurance claims relating to the damage, but later abandoned those claims.

The sale was never completed. TAI sued Investel in 2022, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. As relevant to this appeal, TAI asserted that Investel breached the purchase agreement by failing to complete the subdivision, and breached the covenant of good faith and fair dealing by abandoning its insurance claims. The case went to trial. After TAI presented its evidence to a jury and rested, Investel moved for nonsuit and the trial court granted the motion. TAI appealed.

We find no error in the nonsuit. As to the breach of contract cause of action relating to the subdivision, TAI did not present evidence to support a finding that Investel had a contractual duty to ensure the subdivision was completed, or that Investel caused any delay or denial of the subdivision request. As for the alleged breach of the covenant of good faith and fair dealing, TAI did not present evidence to support a finding that Investel was required to maintain insurance on the property or maintain any insurance claims on TAI's behalf. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Complaint

TAI filed a complaint on May 9, 2022, alleging causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.[1] It alleged that on April 5, 2016, TAI and Investel entered into a purchase agreement stating that TAI would purchase real property on Temple Avenue in Pomona for $2,800,000. The purchase agreement included a provision that TAI would lease the premises while the sale was pending.

TAI alleged, "At the time that the Purchase Agreement was entered into, . . . the subdivision of the Property had not been finalized with the City of Pomona." The purchase agreement describes the property as "Aprx. 12,000 sq ft 2 story commercial building all situated on part of a larger parcel of land." In the space for the legal description of the property, the purchase agreement states, "To follow in escrow."

TAI alleged, "On or about December 26, 2016, the Property was damaged by a windstorm. In April of 2017 the Property was vandalized. In June of 2017 the Property was further damaged by a fire." TAI notified Investel that it still intended to purchase the property, and requested that Investel file a claim with Investel's property insurer. Investel filed the insurance claim, but later abandoned it.

TAI's theories of recovery have shifted over the life of the case. As framed in the complaint, TAI's allegations were as follows. In the first cause of action for breach of contract, TAI alleged that in January 2020, "TAI and Investel agreed that Investel would file an insurance claim for the damages done to

---

[1] TAI's complaint also included a cause of action for specific performance. That claim is not at issue in this appeal.

3

the Property." TAI alleged, "By terms of the Purchase Agreement TAI was entitled to all proceeds paid by the insurance company. When Investel realized that the insurance claim could net over $2,000,000.00, Investel demanded fifty percent (50%) of the insurance claim. TAI refused to give Investel any percentage of the insurance claim." Thereafter, Investel "breached the terms of the Purchase Agreement by abandoning the insurance claim."

In the second cause of action for breach of contract, TAI alleged that Investel "breached the terms of the Purchase Agreement by attempting to unilaterally cancel the Purchase Agreement." No further details were provided.

In the cause of action for breach of the implied covenant of good faith and fair dealing, TAI alleged simply that "Investel did not act in good faith and did not deal fairly with TAI in connection with the Purchase Agreement." TAI sought general damages, attorney fees, and costs.

**B.    Trial**

The case proceeded to a jury trial in July 2024. The following evidence was presented by TAI.

TAI's counsel read to the jury deposition testimony by Lorriana Pang, Investel's former vice president of real estate acquisitions and development. Pang testified about a December 2019 email from Investel to TAI proposing that the parties would make a claim to Investel's insurer for the damage caused by wind, vandalism, and fire, and the parties would equally split the insurance proceeds, if any. The email was also admitted as an exhibit. Pang testified that the email represented a "discussion" or "proposal," "but we never signed on it." Pang said she did not know whether TAI ever agreed to the terms proposed in the email.

4

Pang testified that Investel submitted a fire damage claim to its insurer around December 2019. Investel later canceled the claim. Pang also testified that when she toured the property after the 2017 fire, it was vacant. Trash and some construction materials were on the site, but there was "nothing valuable." Pang believed that the property had been abandoned since 2017, and it was vacant aside from some homeless people occupying it. Pang testified that "after termination of the lease" in December 2020, Investel inspected the property, boarded it up, and ultimately demolished the building.

TAI then called TAI president Henry Aguila to testify. Aguila said that at the time of the purchase agreement in 2016, he intended to use the property as a banquet hall. Aguila testified about signing the purchase agreement; it was entered into evidence. TAI deposited $100,000 into the escrow account. The purchase agreement included a lease agreement allowing TAI to take possession of the property. Aguila testified that TAI began making improvements to the property, including gutting the interior, replacing air conditioners, installing hydraulic lifts for chandeliers, and replacing flooring.

Aguila testified that at the time of the purchase agreement he "assumed that the parcel was ready to be sold," but he found out later "that the subdivision was not complete." Aguila testified that he requested proof that the subdivision was finalized before he would agree to release the $100,000 escrow deposit.

Aguila testified that meanwhile, at the end of 2016, "there was a windstorm, and it caused . . . some roof damage, caused a severe leak in the building." TAI paid for the roof to be repaired. Aguila submitted the claim to his own insurer, which instructed

him to report the loss to Investel's insurer. Aguila testified that he understood section 9.1(m) of the purchase agreement to say that if any losses over $10,000 occurred during escrow, the buyer could back out of the agreement or the buyer was entitled to the seller's insurance proceeds.

Section 9.1 of the purchase agreement, which was admitted as an exhibit, stated that the sale was "contingent upon the satisfaction or waiver of the following contingencies." Paragraph (m) of that section stated, "*Destruction, Damage or Loss*. There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing."

Aguila testified that around June 2017, a fire at a homeless encampment next to the property damaged the building on the property. Aguila asked Investel to report the loss to its insurer. Aguila testified, "At this point, my insurance company still has done nothing, because they are waiting for verification of whether or not the owner, Investel, has coverage or not. So the building

6

has been vacant now for six months waiting for some insurance company to start repair work." Aguila testified that because the building was vacant, "the homeless people kept breaking into the property."

Aguila said he asked Investel to "submit a claim, because my company wants to share in the loss with your company." He testified that after several conversations, Investel proposed that it split any insurance proceeds with TAI. Aguila did not agree to these terms, and at some point, he learned that Investel had withdrawn its insurance claims. In September 2020 Aguila sent an email to Zurich Insurance, Investel's insurer, stating that Investel did not have the right to withdraw its insurance claims because under the purchase agreement, Investel "has assigned the insurance proceeds" to TAI.[2]

Meanwhile, the proposed parcel subdivision was pending with the City of Pomona. Aguila testified that around July 2020, "the City of Pomona and Investel had agreed to the 10:30 curfew for the banquet hall," but Aguila told "the attorney for Investel, 'You guys are crazy, because 10:30 . . . does not work'" for certain types of parties. Instead, Aguila wanted a midnight curfew, and "we still had to take that back to the city and have the city approve the change in that." Aguila also testified that "the city's approval was conditioned upon the property owners agreeing on . . . shared parking, ingress, hours, and everything else. All that had to be worked out."

Aguila testified that Investel attempted to cancel the sale and instructed the escrow company to return TAI's $100,000

---

[2] TAI also called witness John Schoon, a consultant who worked with Investel. Schoon testified that Investel withdrew its insurance claims related to the losses incurred in 2016 and 2017.

7

deposit. Aguila testified that in January 2021, he refused to take his escrow deposit back because he still wanted the sale to be completed. He stated that at the time of trial escrow remained open, and TAI had never received its escrow deposit back. Aguila also testified that the subdivision of the property had never been approved.

Aguila said the building on the property had been demolished; TAI had never received any notice to vacate the premises. Aguila testified TAI had property worth over a million dollars in the building before it was demolished, and "[i]t all disappeared with the building." Aguila further testified that another buyer had offered him $5 million to buy the property, but he was unable to take the offer because the sale with Investel never closed.[3]

On cross-examination, Aguila agreed that in 2017 or 2018 TAI's insurance company, Fidelity, paid TAI's wind damage claim $130,178.00 "just for loss" and $200,480.54 for building damage. For the vandalism that occurred in April 2017, Fidelity paid TAI $120,881.12. On the fire damage claim, Fidelity paid TAI $997,942.25 for building damage and $300,750.00 for loss of rent.

Aguila also agreed that the purchase agreement "does not require [Investel] to have an insurance policy," and that it "recommends that I get my own insurance policy. That's why I got it." TAI rested.

---

[3] Witness Rigo Gutierrez also testified that he saw certain items at the property, including furniture and equipment, before the building was demolished. Information about these items is not in the record on appeal. Witness Miguel Sahagun also testified that he offered to buy the property from Aguila for $5 million.

## C.     Nonsuit

After TAI rested, Investel moved for nonsuit based on insufficiency of the evidence.  The court asked TAI's counsel, "So on this record, a reasonable juror can find that what provision of the contract has been breached by the defense?"  TAI's counsel identified two contentions: that the lot was not subdivided, and that Investel canceled its insurance claims.

Regarding the subdivision, TAI's counsel acknowledged, "It's not written in the contract specifically, and if we're going to look just at the contract, there's no specific provision for . . . the subdivision issues."  He asserted, however, that section 9.1(a)[4] of the purchase agreement "requires disclosures, and at that time, the seller did not disclose that the property had not been approved with its subdivisions."  The court responded, "Is that the best you got?"  After some additional discussion, the court stated, "When you talk about subdivision, you're talking about subdivision to accomplish a certain purpose.  Subdivide what into what?"  The court continued, "So I have no evidence of what subdivision was . . . required, requested? Who was responsible to do it?  By when?"  TAI's counsel responded that the subdivision issue was discussed in emails, but the court stated, "I need something . . . that makes it a contractual obligation. . . . [¶] I have nothing."  The court stated, "I am unable to find that the evidence viewed most favorably to the plaintiff allows any

---

[4]     TAI's counsel actually referenced section 9.1(b), which addresses physical inspections.  Based on the language discussed, however, it appears counsel intended to reference section 9.1(a), which states in part that "Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law. . . . Buyer has 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed."

9

reasonable trier of fact [to find] that some undescribed subdivision is a condition of closing escrow."

Regarding the insurance issue, TAI's counsel pointed to section 9.1(m) of the purchase agreement, which states in part that in the event of damage over $10,000, the buyer is entitled to any insurance proceeds. The court stated, "It really does not address either side's obligation to have such coverage, and in this case, the evidence is . . . the buyer did receive and keep all insurance proceeds paid out on it. It looks like it was by the buyer's carrier." TAI's counsel acknowledged that the purchase agreement "does not require [Investel] to have insurance." The court said, "I'm unable to find there's evidence of a breach of paragraph m regarding insurance coverage, because it didn't require the seller to carry any. It just said, if any insurance proceeds comes in, buyer gets it and that happened." The court added, "I'm finding that the evidence . . . viewed most favorably for the plaintiff does not show transgression of that paragraph."

TAI's counsel moved to amend the complaint to add a cause of action for intentional or negligent misrepresentation as to the subdivision of the property. The court denied the motion, stating, "The amendment would be futile, because I have no discussion, no assent from the other side about a subdivision, the purpose of it, that the other side agreed to it, who is going to be responsible for doing it, and the contract does not specify any of that."

The court therefore granted Investel's nonsuit motion and dismissed the jury. The court entered judgment in favor of Investel. TAI timely appealed.

## DISCUSSION

TAI challenges the court's nonsuit ruling. "A trial court may grant a motion for nonsuit if the plaintiff's evidence would

not support a jury verdict in the plaintiff's favor." (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1013.) "'On review of a judgment of nonsuit . . . we must view the facts in the light most favorable to the plaintiff'. . . . In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.) We review a nonsuit ruling de novo. (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 25.)

## A. Breach of contract

TAI asserts that Investel breached the purchase agreement "by not subdividing the property." "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

TAI notes that section 2 of the purchase agreement describes the property as an "Aprx. 12,000 sq ft 2 story commercial building all situated on part of a larger parcel of land." In the space for the legal description of the property, the purchase agreement states, "To follow in escrow." TAI argues, "[I]t is illegal to convey real estate that is part of a larger parcel and has not been subdivided from the larger parcel." TAI asserts that the "subdivision is an implicit requirement" of the purchase

11

agreement, and Investel's "failure . . . to timely subdivide the property therefore breached" the purchase agreement.[5]

We will assume for the sake of argument that subdivision was legally required before the sale of the property could be completed. (See, e.g., *Cox v. City of Oakland* (2025) 17 Cal.5th 362, 372 [the Subdivision Map Act, Gov. Code, §§ 66410– 66499.41, requires "'an owner who wants to subdivide property to apply for a final or parcel map effecting the subdivision'"]; but see, e.g., Gov. Code, § 66499.30, subd. (e) [allowing "an offer or contract to sell . . . real property . . . where the sale . . . is expressly conditioned upon the approval and filing of a final subdivision map or parcel map"].) Even assuming the subdivision had to be completed before the sale could be finalized, however, TAI has not demonstrated that Investel had any contractual duties or breached any such duties relating to the subdivision.

By arguing that subdivision of the property was an "implicit" requirement, TAI acknowledges that the purchase agreement does not expressly require Investel to ensure that the subdivision was completed. Indeed, Aguila testified that when he learned that a subdivision was pending, he considered "put[ting] something in the escrow instructions that contemplates what's

---

[5]     TAI apparently has abandoned the contention asserted in the trial court that Investel breached the disclosures portion of the contract. TAI asserts new arguments in its reply brief on appeal that the purchase agreement set a certain date for closing and the subdivision was required to be complete by that date. "[P]oints raised for the first time in a reply brief will ordinarily not be considered" (*Rubinstein v. Fakheri*(2020) 49 Cal.App.5th 797, 809), and TAI has offered no good cause to depart from that general rule here.

going to happen here," but there was no evidence presented that any such revision was made. Thus, TAI has failed to demonstrate that Investel had a contractual duty under the purchase agreement relating to subdividing the property. This alone is sufficient to support the judgment of nonsuit on this issue.

Even if Investel did have a contractual duty regarding the subdivision, TAI presented no evidence to support a finding that Investel breached that duty by causing approval of the subdivision to be delayed or denied. Indeed, the evidence showed that TAI was at least partially responsible for the delays. Aguila testified that negotiations regarding the subdivision were ongoing in July 2020 because although "the City of Pomona and Investel had agreed to the 10:30 curfew for the banquet hall," Aguila refused to accept that curfew. In addition, Aguila testified that "the city's approval was conditioned upon . . . an agreement as to shared parking, ingress, egress, hours, and everything else. All that had to be worked out." Aguila noted several times in his testimony that these negotiations were largely happening during Covid shutdowns, which caused delays. TAI did not present evidence to support a conclusion that Investel's actions had any impact on the delays or denial of the proposed subdivision.

Without evidence of a contractual duty or a breach of that duty, nonsuit was properly granted.

## B. Breach of the implied covenant of good faith and fair dealing

TAI also contends the trial court erred in granting nonsuit on its contention that Investel was required to maintain its insurance claims on behalf of TAI. TAI asserts this argument only in terms of its cause of action for breach of the implied

13

covenant of good faith and fair dealing, not as a breach of contract.

A covenant of good faith and fair dealing is implied by law in every contract. (See, e.g., *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (2025) 112 Cal.App.5th 519, 556; *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1244.) The covenant "functions '"as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."'" (*Thrifty Payless, supra*, 218 Cal.App.4th at p. 1244.) The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 349-350; see also 1 Witkin, Summary of Cal. Law (11th ed. 2025) Contracts, § 822 ["Breach of the covenant of good faith and fair dealing rests on the existence of a specific contractual obligation. The implied covenant does not impose substantive terms and conditions beyond those to which the parties actually agreed."].)

TAI argues, "[E]ven though it was discretionary on the part of Investel whether to carry insurance, Investel did, in fact, carry insurance," so under the terms of the purchase agreement, TAI had a contractual right to any insurance proceeds. Thus, according to TAI, Investel acted in bad faith by canceling its insurance claims and "wrongfully denying TAI the benefits" of the purchase agreement.

The purchase agreement does not include express terms or an implied covenant requiring Investel to maintain an insurance policy on the property. Nor does the contract expressly or

14

impliedly require Investel to make or maintain insurance claims for TAI's benefit. Rather, section 9.1(m) of the purchase agreement states only that if damage occurs during escrow and "the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss." It is undisputed that damage did occur, and that TAI collected insurance proceeds of more than $1,750,000. The obligations of section 9.1(m) were therefore met. Nothing in the purchase agreement suggests that the property was required to be double-insured, or that the seller was required to maintain insurance. No evidence in the record on appeal suggests that TAI's losses exceeded the amount reimbursed by insurance, nor does any evidence suggest that Investel was required to make up for such a shortfall. Thus, TAI did not demonstrate that Investel frustrated TAI's right to the benefits of the contract.

TAI also argues that Investel's actions "effectively . . . denied TAI's contractual right to purchase the building since no reasonable buyer would be willing to still pay $2,800,000 for a building that had subsequently sustained $2,000,000 in damage, without receipt of insurance proceeds that would enable repair of the damage." This argument is directly contradicted by the record. Aguila testified that as of January 2021—several years after the building was damaged in 2016 and 2017—he refused to terminate escrow: "I didn't want the $100,000 [escrow deposit] back. I wanted to continue with the transaction." He testified that he told the escrow company "that I reject the offer to cancel the escrow instructions." As noted above, Aguila also testified that TAI collected insurance proceeds of more than $1,750,000—

thus, TAI did receive "insurance proceeds that would enable repair of the damage."

Aguila further argues that Investel "denied TAI the benefit of the Contract by having the building razed," and Investel "cancelled the insurance claim and razed the building in bad faith . . . because TAI would not agree to split the insurance proceeds with Investel." This was not a basis for TAI's claims below, and TAI cites no evidence to support its contentions about Investel's motivations. Indeed, TAI presented very little evidence about when or why the building was demolished, other than Pang's testimony that "after termination of the lease," she found the building to be abandoned before it was demolished on some unspecified date. As such, TAI has not demonstrated that the trial court erred in granting nonsuit on TAI's cause of action for breach of the implied covenant of good faith and fair dealing.

## DISPOSITION

The judgment is affirmed. Investel is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


ZUKIN, P. J.


TAMZARIAN, J.

16